# MURRAY, DIRECTOR, VIRGINIA DEPARTMENT OF CORRECTIONS, ET AL. *v.* GIARRATANO ET AL.

No. 88–411.   Argued March 22, 1989—Decided June 23, 1989

REHNQUIST, C. J., announced the judgment of the Court and delivered an opinion, in which WHITE, O'CONNOR, and SCALIA, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 13. KENNEDY, J., filed an opinion concurring in the judgment, in which O'CONNOR, J., joined, *post*, p. 14. STEVENS, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 15.

*Robert Q. Harris*, Assistant Attorney General of Virginia, argued the cause for petitioners. With him on the briefs were *Mary Sue Terry*, Attorney General, *H. Lane Kneedler*, Chief Deputy Attorney General, *Stephen D. Rosenthal*, Deputy Attorney General, and *Francis S. Ferguson*, Assistant Attorney General.

*Gerald T. Zerkin* argued the cause for respondents. With him on the brief were *Jonathan D. Sasser* and *Martha A. Geer*.*

CHIEF JUSTICE REHNQUIST announced the judgment of the Court and delivered an opinion, in which JUSTICE WHITE, JUSTICE O'CONNOR, and JUSTICE SCALIA join.

Virginia death row inmates brought a civil rights suit against various officials of the Commonwealth of Virginia. The prisoners claimed, based on several theories, that the Constitution required that they be provided with counsel at the Commonwealth's expense for the purpose of pursuing collateral proceedings related to their convictions and sentences. The courts below ruled that appointment of counsel upon request was necessary for the prisoners to enjoy their

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Elizabeth Alexander, Alvin J. Bronstein, Steven R. Shapiro*, and *John A. Powell*; for the Maryland State Bar Association et al. by *John H. Blume*; and for the National Legal Aid & Defender Association et al. by *Ephraim Margolin* and *Steven M. Pesner*.

*Robert D. Raven, Ronald J. Tabak, George H. Kendall*, and *Clifford D. Stromberg* filed a brief for the American Bar Association as *amicus curiae*.

constitutional right to access to the courts in pursuit of state habeas corpus relief. We think this holding is inconsistent with our decision two Terms ago in *Pennsylvania* v. *Finley*, 481 U. S. 551 (1987), and rests on a misreading of our decision in *Bounds* v. *Smith*, 430 U. S. 817 (1977).

Joseph M. Giarratano is a Virginia prisoner under a sentence of death. He initiated this action under 42 U. S. C. § 1983, by *pro se* complaint in Federal District Court, against various state officials including Edward W. Murray who is the Director of the Virginia Department of Corrections. Some months later, the District Court certified a class comprising all current and future Virginia inmates awaiting execution who do not have and cannot afford counsel to pursue postconviction proceedings.[1] The inmates asserted a number of constitutional theories for an entitlement to appointed counsel and the case was tried to the court.

After the evidence, post-trial briefs, and other memoranda, the District Court expressed "serious doubts as to the viability of many of th[e] theories." 668 F. Supp. 511, 512 (ED Va. 1986). It was, however, "satisfied that the United States Supreme Court's decision in *Bounds* dictates that the plaintiffs here be granted some form of relief." *Ibid.* The District Court noted three special "considerations" relating to death row inmates that it believed required that these inmates receive greater assistance than *Bounds* had outlined. It found that death row inmates had a limited amount of time to prepare their petitions, that their cases were unusually complex, and that the shadow of impending execution would interfere with their ability to do legal work. These "consid-

---

[1] In precise terms, the class was defined as

"all persons, now and in the future, sentenced to death in Virginia, whose sentences have been or are subsequently affirmed by the Virginia Supreme Court and who either (1) cannot afford to retain and do not have attorneys to represent them in connection with their post-conviction proceedings, or (2) could not afford to retain and did not have attorneys to represent them in connection with a particular post-conviction proceeding." App. 32.

erations" led the court to believe that the "plaintiffs are incapable of effectively using lawbooks to raise their claims." As a result, it found that Virginia's policy of either allowing death row inmates time in the prison law library or permitting them to have lawbooks sent to their cells did "little to satisfy Virginia's obligation."[2]   668 F. Supp., at 513.   "Virginia must fulfill its duty by providing these inmates trained legal assistance."   *Ibid.*

The District Court then evaluated the avenues by which inmates convicted of capital crimes could obtain the aid of counsel in Virginia.   It found inadequate the availability of "unit attorneys" appointed by Virginia to the various penal institutions to assist inmates in incarcertion-related litigation.   *Id.*, at 514.   Further, it found that "[e]ven if Virginia appointed additional institutional attorneys to service death row inmates, its duty under *Bounds* would not be fulfilled" because, acting "only as legal advisors," "[t]he scope of assistance these attorneys provide is simply too limited."   *Ibid.*   Along the same lines, the District Court concluded that Virginia's provisions for appointment of counsel after a petition is filed did not cure the problem.[3]   This was primarily because "the

---

[2] Virginia houses its death row inmates at the Mecklenberg Correctional Center, the Virginia State Penitentiary, and the Powhatan Correctional Center.   Each of these three centers maintain law libraries.   Inmates at Mecklenberg are allowed two library periods per week; inmates at the other facilities may borrow materials from the prison library for use in their cells.

[3] At the time the District Court decided the case, Virginia courts were authorized to appoint counsel to individual inmates as follows:

"Any person, who has been a resident of this State for a continuous period of six months, who on account of his poverty is unable to pay fees or costs may be allowed by a court to sue or defend a suit therein, without paying fees or costs; whereupon he shall have, from any counsel whom the court may assign him, and from all officers, all needful services and process, without any fees to them therefore, except what may be included in the costs recovered from the opposite party."   Va. Code § 14.1–183 (1950).

The Virginia Code was amended in 1987 to delete the 6-month residency requirement.   Va. Code § 14.1–183 ( Supp. 1988).   It is unclear whether,

timing of the appointment is a fatal defect" as the inmate "would not receive the attorney's assistance in the critical stages of developing his claims." *Id.*, at 515.

Even together, Virginia's efforts did not afford prisoners a meaningful right of access to the courts, in the opinion of the District Court, because they did not guarantee them "the continuous assistance of counsel." *Ibid.* With what the District Court feared was the imminent depletion of the pool of volunteer attorneys willing to help Virginia death row inmates attack their convictions and sentences, the court felt that "[t]he stakes are simply too high for this Court not to grant, at least in part, some relief." It therefore ordered Virginia to develop a program for the appointment of counsel, upon request, to indigent death row inmates wishing to pursue habeas corpus in state court. *Id.*, at 517. It decided, however, that the decision in *Ross* v. *Moffitt*, 417 U. S. 600 (1974), indicated that Virginia had no similar constitutional obligation to appoint counsel for the pursuit of habeas corpus in federal court. 668 F. Supp., at 516–517.

On appeal to the United States Court of Appeals for the Fourth Circuit, a divided panel reversed the District Court's judgment that the Commonwealth was constitutionally required to provide personal attorneys to represent death row inmates in state collateral proceedings. 836 F. 2d 1421 (1988). But that court, en banc, subsequently reheard the case and affirmed the District Court. 847 F. 2d 1118 (1988). The en banc court viewed as findings of fact the special "considerations" relating to death row inmates which had led the District Court to conclude that Virginia was not in compliance with the constitutional rights of access. It accepted these findings as not clearly erroneous and so affirmed the the District Court's remedial order. The en banc court did not believe the case to be controlled by *Pennsylvania* v.

---

in review of capital cases, counsel will be appointed under this statute or otherwise prior to filing and unless the petition presents a nonfrivolous claim. See *Darnell* v. *Peyton*, 208 Va. 675, 160 S. E. 2d 749 (1968).

*Finley*, 481 U. S. 551 (1987), which held that the Constitution did not require States to provide counsel in postconviction proceedings. *"Finley* was not a meaningful access case, nor did it address the rule enunciated in *Bounds* v. *Smith."* 847 F. 2d, at 1122. "Most significantly," thought the Fourth Circuit, *"Finley* did not involve the death penalty." *Ibid.* Four judges dissented. We granted certiorari, 488 U. S. 923 (1988), and now reverse.

In *Finley* we ruled that neither the Due Process Clause of the Fourteenth Amendment nor the equal protection guarantee of "meaningful access" required the State to appoint counsel for indigent prisoners seeking state postconviction relief. The Sixth and Fourteenth Amendments to the Constitution assure the right of an indigent defendant to counsel at the trial stage of a criminal proceeding, *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), and an indigent defendant is similarly entitled as a matter of right to counsel for an initial appeal from the judgment and sentence of the trial court. *Douglas* v. *California*, 372 U. S. 353 (1963); *Griffin* v. *Illinois*, 351 U. S. 12 (1956). But we held in *Ross* v. *Moffitt, supra,* at 610, that the right to counsel at these earlier stages of a criminal procedure did not carry over to a discretionary appeal provided by North Carolina law from the intermediate appellate court to the Supreme Court of North Carolina. We contrasted the trial stage of a criminal proceeding, where the State by presenting witnesses and arguing to a jury attempts to strip from the defendant the presumption of innocence and convict him of a crime, with the appellate stage of such a proceeding, where the defendant needs an attorney "not as a shield to protect him against being 'haled into court' by the State and stripped of his presumption of innocence, but rather as a sword to upset the prior determination of guilt." 417 U. S., at 610–611.

We held in *Finley* that the logic of *Ross* v. *Moffitt* required the conclusion that there was no federal constitutional right

to counsel for indigent prisoners seeking state postconviction relief:

> "Postconviction relief is even further removed from the criminal trial than is discretionary direct review. It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature. See *Fay* v. *Noia*, 372 U. S. 391, 423–424 (1963). . . . States have no obligation to provide this avenue of relief, cf. *United States* v. *MacCollom*, 426 U. S. 317, 323 (1976) (plurality opinion), and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the state supply a lawyer as well." 481 U. S., at 556–557.

Respondents, like the courts below, believe that *Finley* does not dispose of respondents' constitutional claim to appointed counsel in habeas proceedings because *Finley* did not involve the death penalty.[4] They argue that, under the Eighth Amendment, "evolving standards of decency" do not permit a death sentence to be carried out while a prisoner is unrepresented. Brief for Respondents 47. In the same vein, they contend that due process requires appointed counsel in postconviction proceedings, because of the nature of the punishment and the need for accuracy. *Id.*, at 48–49.

We have recognized on more than one occasion that the Constitution places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death. See, *e. g.*, *Beck* v. *Alabama*, 447 U. S. 625 (1980) (trial judge must give jury the option to convict of a lesser offense); *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (jury must be allowed to consider all of a capital defendant's mitigating character evidence); *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982) (same). The finality of the death penalty re-

---

[4] Respondents offer this theory—that the Constitution requires postconviction cases involving the death penalty to be treated differently from other postconviction cases—as a basis for affirmance in addition to their reliance on *Bounds* v. *Smith*, 430 U. S. 817 (1977), discussed later.

quires "a greater degree of reliability" when it is imposed. *Lockett, supra,* at 604.

These holdings, however, have dealt with the trial stage of capital offense adjudication, where the court and jury hear testimony, receive evidence, and decide the questions of guilt and punishment. In *Pulley* v. *Harris,* 465 U. S. 37 (1984), we declined to hold that the Eighth Amendment required appellate courts to perform proportionality review of death sentences. And in *Satterwhite* v. *Texas,* 486 U. S. 249, 256 (1988), we applied the traditional appellate standard of harmless-error review set out in *Chapman* v. *California,* 386 U. S. 18 (1967), when reviewing a claim of constitutional error in a capital case.

We have similarly refused to hold that the fact that a death sentence has been imposed requires a different standard of review on federal habeas corpus. In *Smith* v. *Murray,* 477 U. S. 527, 538 (1986), a case involving federal habeas corpus, this Court unequivocally rejected "the suggestion that the principles [governing procedural fault] of *Wainwright* v. *Sykes*[, 433 U. S. 72 (1977),] apply differently depending on the nature of the penalty a State imposes for the violation of its criminal laws" and similarly discarded the idea that "there is anything 'fundamentally unfair' about enforcing procedural default rules . . . ." *Id.,* at 538–539. And, in *Barefoot* v. *Estelle,* 463 U. S. 880, 887 (1983), we observed that "direct appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception."

Finally, in *Ford* v. *Wainwright,* 477 U. S. 399 (1986), we held that the Eighth Amendment prohibited the State from executing a validly convicted and sentenced prisoner who was insane at the time of his scheduled execution. Five Justices of this Court, however, rejected the proposition that "the ascertainment of a prisoner's sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding." *Id.,* at 411–412. Justice Powell recognized that the prison-

er's sanity at the time of execution was "not comparable to the antecedent question of whether the petitioner should be executed at all." *Id.*, at 425. "It follows that this Court's decisions imposing heightened procedural requirements on capital trials and sentencing proceedings do not apply in this context." *Ibid.* (citations omitted); *id.*, at 429 (O'CONNOR, J., joined by WHITE, J., dissenting in part and concurring in result in part) (due process requirements minimal); *id.*, at 434 (REHNQUIST, J., joined by Burger, C. J., dissenting) (wholly executive procedures sufficient).

We think that these cases require the conclusion that the rule of *Pennsylvania* v. *Finley* should apply no differently in capital cases than in noncapital cases. State collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings and serve a different and more limited purpose than either the trial or appeal.[5] The additional safeguards imposed by the Eighth Amendment at the trial stage of a capital case are, we think, sufficient to assure the reliability of the process by which the death penalty is imposed. We therefore decline to read either the Eighth Amendment or the Due Process Clause to require yet another distinction between the rights of capital case defendants and those in noncapital cases.

---

[5] The dissent offers surveys to show that Virginia is one of a handful of States without a "system for appointing counsel for condemned prisoners before a postconviction petition is filed." *Post*, at 31. But even these surveys indicate that only 18 of the 37 States make such appointment automatic. *Post*, at 30. These 18 States overlap to a significant extent with the 13 States that have created "resource centers to assist counsel in litigating capital cases," *post*, at 30–31, which, in any event, is not the same thing as requiring automatic appointment of counsel before the filing of a petition. Consequently, a substantial balance of States do not accord the right that the dissent would require Virginia to grant as a matter of constitutional law. Virginia courts presently have the authority to appoint counsel to represent any inmate in state habeas proceedings, Va. Code § 14.1–183 (Supp. 1988), and the attorney general represents that such appointments have been made, upon request, before the filing of any petition. Brief for Petitioners 6–7.

The dissent opines that the rule that it would constitutionally mandate "would result in a net benefit to Virginia." *Post*, at 30. But this "mother knows best" approach should play no part in traditional constitutional adjudication. Even as a matter of policy, the correctness of the dissent's view is by no means self-evident. If, as we said in *Barefoot* v. *Estelle, supra,* direct appeal is the primary avenue for review of capital cases as well as other sentences, Virginia may quite sensibly decide to concentrate the resources it devotes to providing attorneys for capital defendants at the trial and appellate stages of a capital proceeding. Capable lawyering there would mean fewer colorable claims of ineffective assistance of counsel to be litigated on collateral attack.

The Court of Appeals, as an additional basis for its holding, relied on what it perceived as a tension between the rule in *Finley* and the implication of our decision in *Bounds* v. *Smith,* 430 U. S. 817 (1977); we find no such tension. Whether the right of access at issue in *Bounds* is primarily one of due process or equal protection,[6] in either case it rests on a constitutional theory considered in *Finley.* The Court held in *Bounds* that a prisoner's "right of access" to the courts required a State to furnish access to adequate law libraries in order that the prisoners might prepare petitions for judicial relief. *Bounds, supra,* at 828. But it would be a strange jurisprudence that permitted the extension of that holding to partially overrule a subsequently decided case such as *Finley* which held that prisoners seeking judicial relief from their sentence in state proceedings were not entitled to counsel.

It would be an even stranger jurisprudence to allow, as the dissent would, the "right of access" involved in *Bounds* v. *Smith, supra,* to partially overrule *Pennsylvania* v. *Finley,*

---

[6] The prisoner's right of access has been described as a consequence of the right to due process of law, see *Procunier* v. *Martinez,* 416 U. S. 396, 419 (1974), and as an aspect of equal protection, see *Pennsylvania* v. *Finley,* 481 U. S. 551, 557 (1987).

based on "factual" findings of a particular district court regarding matters such as the perceived difficulty of capital sentencing law and the general psychology of death row inmates. Treating such matters as "factual findings," presumably subject only to review under the "clearly-erroneous" standard, would permit a different constitutional rule to apply in a different State if the district judge hearing that claim reached different conclusions. Our cases involving the right to counsel have never taken this tack; they have been categorical holdings as to what the Constitution requires with respect to a particular stage of a criminal proceeding in general. See *Powell* v. *Alabama*, 287 U. S. 45 (1932); *Griffin* v. *Illinois*, 351 U. S. 12 (1956); *Gideon* v. *Wainwright*, 372 U. S. 335 (1963); *Douglas* v. *California*, 372 U. S. 353 (1963); *Ross* v. *Moffitt*, 417 U. S. 600 (1974); *Pennsylvania* v. *Finley*, 481 U. S. 551 (1987). Indeed, as the dissent itself points out, *post*, at 17, and n. 2, it was the Court's dissatisfaction with the case-by-case approach of *Betts* v. *Brady*, 316 U. S. 455 (1942), that led to the adoption of the categorical rule requiring appointed counsel for indigent felony defendants in *Gideon*.

There is no inconsistency whatever between the holding of *Bounds* and the holding in *Finley;* the holding of neither case squarely decides the question presented in this case. For the reasons previously stated in this opinion, we now hold that *Finley* applies to those inmates under sentence of death as well as to other inmates, and that holding necessarily imposes limits on *Bounds.*[7]

---

[7] Many States automatically provide counsel to death row inmates in state habeas corpus proceedings, as a matter of state law. See, *e. g.*, Ariz. Rule Crim. Proc. 32.5(b); Conn. Gen. Stat. § 51–296(a) (1985); Okla. Stat., Tit. 22, § 1089 (Supp. 1988); Ore. Rev. Stat. § 138.590(3) (1987). Under the Anti-Drug Abuse Act of 1988, attorneys will be appointed in federal habeas corpus actions involving a challenge to a death sentence. See § 7001(b), Pub. L. 100–690, 102 Stat. 4393, 21 U. S. C. § 848(q)(4)(B) (1988 ed.). Respondents suggest that appointment of counsel might even benefit Virginia by speeding, or at least clarifying, the Virginia postconviction process. The situation of death row inmates may well be the basis for

Petitioners and respondents disagree as to the practices currently in effect in Virginia state prisons with respect to death row prisoners. Respondents contend that these prisoners are denied adequate and timely access to a law library during the final weeks before the date set for their execution. If respondents are correct, the District Court on remand may remedy this situation without any need to enlarge the holding of *Bounds*.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE O'CONNOR concurring.

I join in THE CHIEF JUSTICE's opinion. As his opinion demonstrates, there is nothing in the Constitution or the precedents of this Court that requires that a State provide counsel in postconviction proceedings. A postconviction proceeding is not part of the criminal process itself, but is instead a civil action designed to overturn a presumptively valid criminal judgment. Nothing in the Constitution requires the States to provide such proceedings, see *Pennsylvania* v. *Finley*, 481 U. S. 551 (1987), nor does it seem to me that the Constitution requires the States to follow any particular federal model in those proceedings. I also join in JUSTICE KENNEDY's opinion concurring in the judgment, since I do not view it as inconsistent with the principles expressed above. As JUSTICE KENNEDY observes, our decision in *Bounds* v. *Smith*, 430 U. S. 817 (1977), allows the States considerable discretion in assuring that those imprisoned in their jails obtain meaningful access to the judicial process. Beyond the requirements of *Bounds*, the matter is one of legislative choice based on difficult policy considerations and the allocation of scarce legal resources. Our decision today rightly leaves these issues to resolution by Congress and the state legislatures.

state policy to provide them extra legal assistance or more lenient standards of *pro se* pleading.

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

It cannot be denied that collateral relief proceedings are a central part of the review process for prisoners sentenced to death. As JUSTICE STEVENS observes, a substantial proportion of these prisoners succeed in having their death sentences vacated in habeas corpus proceedings. *Post*, at 23–24, and n. 13. The complexity of our jurisprudence in this area, moreover, makes it unlikely that capital defendants will be able to file successful petitions for collateral relief without the assistance of persons learned in the law.

The requirement of meaningful access can be satisfied in various ways, however. This was made explicit in our decision in *Bounds* v. *Smith*, 430 U. S. 817 (1977). The intricacies and range of options are of sufficient complexity that state legislatures and prison administrators must be given "wide discretion" to select appropriate solutions. *Id.*, at 833. Indeed, judicial imposition of a categorical remedy such as that adopted by the court below might pretermit other responsible solutions being considered in Congress and state legislatures. Assessments of the difficulties presented by collateral litigation in capital cases are now being conducted by committees of the American Bar Association and the Judicial Conference of the United States, and Congress has stated its intention to give the matter serious consideration. See 134 Cong. Rec. 33237 (1988) (providing for expedited consideration of proposals of the Judicial Conference committee).

Unlike Congress, this Court lacks the capacity to undertake the searching and comprehensive review called for in this area, for we can decide only the case before us. While Virginia has not adopted procedures for securing representation that are as far reaching and effective as those available in other States, no prisoner on death row in Virginia has been unable to obtain counsel to represent him in postconviction proceedings, and Virginia's prison system is staffed with in-

stitutional lawyers to assist in preparing petitions for post-conviction relief. I am not prepared to say that this scheme violates the Constitution.

On the facts and record of this case, I concur in the judgment of the Court.

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

Two Terms ago this Court reaffirmed that the Fourteenth Amendment to the Federal Constitution obligates a State "'to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process.'" *Pennsylvania* v. *Finley,* 481 U. S. 551, 556 (1987) (quoting *Ross* v. *Moffitt,* 417 U. S. 600, 616 (1974)). The narrow question presented is whether that obligation includes appointment of counsel for indigent death row inmates who wish to pursue state postconviction relief. Viewing the facts in light of our precedents, we should answer that question in the affirmative.

I

The parties before us, like the Court of Appeals en banc and the District Court below, have accorded controlling importance to our decision in *Bounds* v. *Smith,* 430 U. S. 817 (1977).[1] In that case, inmates had alleged that North Caro-

---

[1] Compare Brief for Petitioners 23 ("The notion that the access right is to be measured against the assistance that might be provided an inmate by a personal lawyer has no support in *Bounds.* Indeed, the idea is entirely inconsistent with the limited nature of the right") with Brief for Respondents 25 ("The district court's findings, conclusion, and remedy all comprise ι conventional application of *Bounds* in an extraordinary context").

Although the Court of Appeals en banc and the District Court placed singular reliance on *Bounds,* both indicated that they would have reached the same result on the other legal theories as well. 847 F. 2d 1118, 1122, n. 8 (CA4 1988) ("Because of the peculiar nature of the death penalty, we find it difficult to envision any situation in which appointed counsel would not be required in state post-conviction proceedings when a prisoner under the sentence of death could not afford an attorney"); 668 F. Supp.

lina violated the Fourteenth Amendment by failing to provide research facilities to help them prepare habeas corpus petitions and federal civil rights complaints. Stressing "meaningful" access to the courts as a "touchstone," *id.*, at 823, we held:

> "[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.*, at 828.

Far from creating a discrete constitutional right, *Bounds* constitutes one part of a jurisprudence that encompasses "right-to-counsel" as well as "access-to-courts" cases. Although each case is shaped by its facts, all share a concern, based upon the Fourteenth Amendment, that accused and convicted persons be permitted to seek legal remedies without arbitrary governmental interference.

At the fountainhead of this body of law is *Powell* v. *Alabama*, 287 U. S. 45, 69 (1932), which recognized that "[e]ven the intelligent and educated layman . . . requires the guiding hand of counsel at every step in the proceedings against him." The Court reversed the convictions and death sentences of seven black men, charged with the rape of two white women, because the state court failed to designate counsel until the morning of trial. Reasoning that the "notice and hearing" guaranteed by the Due Process Clause "would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel," *id.*, at 68–69, the Court held:

> "[I]n a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble mindedness, illiteracy, or the like, it is the duty of the court, whether

---

511, 516, n. 4 (ED Va. 1986) ("[C]hanging the theory under which relief is sought would not alter the analysis").

requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case." *Id.*, at 71.

Particular circumstances thus defined the degree to which the Fourteenth Amendment protected petitioners in *Powell* against arbitrary criminal prosecution or punishment. Similarly, in *Griffin* v. *Illinois*, 351 U. S. 12, 18–19 (1956), the Court focused on "[s]tatistics show[ing] that a substantial proportion of criminal convictions are reversed by state appellate courts" in concluding that once a State allows appeals of convictions, it cannot administer its appellate process in a discriminatory fashion. Finding no rational basis for requiring appellants to pay for trial transcripts, "effectively den[ying] the poor an adequate appellate review accorded to all who have money enough to pay the costs in advance," the Court held that the Fourteenth Amendment required States to furnish transcripts to indigents. *Id.*, at 18. Accord, *Burns* v. *Ohio*, 360 U. S. 252 (1959) ($20 fee to file appeal). The principles articulated in *Griffin* soon were applied to invalidate similar restraints on state postconviction review. *Lane* v. *Brown*, 372 U. S. 477 (1963) (transcript); *Smith* v. *Bennett*, 365 U. S. 708 (1961) (filing fee).

On the same day in 1963, the Court held that the Fourteenth Amendment guaranteed indigent defendants assistance of counsel both at trial, *Gideon* v. *Wainwright*, 372 U. S. 335, and on their first appeal as of right, *Douglas* v. *California*, 372 U. S. 353. Applying the Sixth Amendment's express right of counsel to the States, the Court in *Gideon* departed from the special circumstances analysis in favor of a categorical approach.[2] But because of the absence

---

[2] See *Gideon*, 372 U. S., at 342–344. Justice Harlan made explicit *Gideon*'s abandonment of the special circumstances rule in the context of the right to counsel in serious criminal prosecutions. *Id.*, at 350–351 (concurring opinion). But see *id.*, at 348, n. 2 (Clark, J., concurring in result)

18

of a constitutional right to appeal, see *McKane* v. *Durston*, 153 U. S. 684 (1894), the Court decided *Douglas* by assessing the facts in light of the Fourteenth Amendment.[3] The Court's reasons for invalidating California's appellate procedure—by which the appellate court undertook an *ex parte* examination of "the barren record" to determine whether an appeal merited appointment of counsel, 372 U. S., at 356—echoed its earlier statements in *Griffin:*

> "When an indigent is forced to run this gantlet of a preliminary showing of merit, the right to appeal does not comport with fair procedure. . . . [T]he discrimination is not between 'possibly good and obviously bad cases,' but between cases where the rich man can require the court to listen to argument of counsel before deciding on the merits, but a poor man cannot. . . . The indigent, where the record is unclear or the errors are hidden, has only the right to a meaningless ritual, while the rich man has a meaningful appeal." *Douglas*, 372 U. S., at 357–358.

In two subsequent opinions the Court rejected inmates' attempts to secure legal assistance. In *Ross* v. *Moffitt*, 417 U. S. 600 (1974), the Court held there was no right to appointment of counsel for discretionary state appeals or certiorari petitions to this Court. It later announced for the first

---

(linking *Gideon* to *Griffin* v. *Illinois*, 351 U. S. 12 (1956), and *Ferguson* v. *Georgia*, 365 U. S. 570 (1961), also a Fourteenth Amendment case).

[3] The Court consistently has adhered to Justice Sutherland's observation in *Powell* v. *Alabama*, 287 U. S. 45, 53, 71 (1932), that when assistance of counsel is required, that assistance must be "effective" rather than *pro forma*. See *Evitts* v. *Lucey*, 469 U. S. 387 (1985); *Strickland* v. *Washington*, 466 U. S. 668 (1984); *Wainwright* v. *Torna*, 455 U. S. 586 (1982) *(per curiam)*. Cf. *Penson* v. *Ohio*, 488 U. S. 75, 85 (1988) ("The need for forceful advocacy does not come to an abrupt halt as the legal proceeding moves from the trial to appellate stage. Both stages of the prosecution, although perhaps involving unique legal skills, require careful advocacy to ensure that rights are not forgone and that substantial legal and factual arguments are not inadvertently passed over").

time that a State has no obligation to provide defendants with any collateral review of their convictions, and that if it does, "the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well." *Pennsylvania* v. *Finley*, 481 U. S., at 557. Although one might distinguish these opinions as having a different legal basis than the present case,[4] it is preferable to consider them, like *Powell*, *Griffin*, *Douglas*, and *Bounds*, as applications of the Fourteenth Amendment's guarantees to particular situations. Indeed the Court reaffirmed in *Ross*:

> "The Fourteenth Amendment . . . does require that the state appellate system be 'free of unreasoned distinctions,' *Rinaldi* v. *Yeager*, 384 U. S. 305, 310 (1966), and that indigents have an adequate opportunity to present their claims fairly within the adversary system. *Griffin* v. *Illinois*, *supra; Draper* v. *Washington*, 372 U. S. 487 (1963). The State cannot adopt procedures which leave an indigent defendant 'entirely cut off from any appeal at all,' by virtue of his indigency, *Lane* v. *Brown*, 372 U. S., at 481, or extend to such indigents merely a 'meaningless ritual' while others in better economic circumstances have a 'meaningful appeal.' *Douglas* v. *California*, *supra*, at 358. The question is not one of absolutes, but one of degrees." 417 U. S., at 612.

## II

These precedents demonstrate that the appropriate question in this case is not whether there is an absolute "right to counsel" in collateral proceedings, but whether due process requires that these respondents be appointed counsel in order to pursue legal remedies. Three critical differences between *Finley* and this case demonstrate that even if it is

---

[4] The en banc majority below, for instance, distinguished *Pennsylvania* v. *Finley*, 481 U. S. 551 (1987), in part on the ground that it "was not a meaningful access case, nor did it address the rule enunciated in *Bounds* v. *Smith*." 847 F. 2d, at 1122.

permissible to leave an ordinary prisoner to his own re-
sources in collateral proceedings, it is fundamentally unfair to
require an indigent death row inmate to initiate collateral re-
view without counsel's guiding hand.   I shall address each of
these differences in turn.

*First.*   These respondents, like petitioners in *Powell* but
unlike respondent in *Finley*, have been condemned to die.
Legislatures conferred greater access to counsel on capital
defendants than on persons facing lesser punishment even in
colonial times.[5]   Our First Congress required assignment of
up to two attorneys to a capital defendant at the same time it
initiated capital punishment;[6] nearly a century passed before
Congress provided for appointment of counsel in other con-
texts.   See *Mallard* v. *United States District Court*, 490
U. S. 296 (1989) (interpreting Act of July 20, 1892, ch. 209,
§ 1, 27 Stat. 252, now codified at 28 U. S. C. § 1915(d)).   Sim-
ilarly, Congress at first limited the federal right of appeal to
capital cases.   See *Evitts* v. *Lucey*, 469 U. S. 387, 409 (1985)
(REHNQUIST, J., dissenting).   Just last year, it enacted a
statute requiring provision of counsel for state and federal
prisoners seeking federal postconviction relief—but only if
they are under sentence of death.[7]

---

[5] The Colonies of Pennsylvania, South Carolina, and Virginia made
counsel more available to capital defendants than to persons accused of
other offenses.   See *Powell*, 287 U. S., at 61–63, 65.

[6] Act of Apr. 30, 1790, ch. 9, §§ 1, 3, 8–10, 14, 1 Stat. 112–115 (authoriz-
ing death sentence for willful murder, treason, and other crimes); *id.*, § 29,
1 Stat. 118, as amended, 18 U. S. C. § 3005 (requiring appointment of coun-
sel for capital defendants).

[7] The Anti-Drug Abuse Act of 1988, § 7001(b), Pub. L. 100–690, 102
Stat. 4393–4394, codified at 21 U. S. C. §§ 848(q)(4)(B), (q)(8) (1988 ed.)
provides in pertinent part:

"(B) In any post conviction proceeding under section 2254 or 2255 of title
28, United States Code, seeking to vacate or set aside a death sentence,
any defendant who is or becomes financially unable to obtain adequate
representation or investigative, expert, or other reasonably necessary
services shall be entitled to the appointment of one or more attorneys and

This Court also expanded capital defendants' ability to secure counsel and other legal assistance long before bestowing similar privileges on persons accused of less serious crimes.[8] Both before and after *Furman* v. *Georgia*, 408 U. S. 238 (1972), established that the Constitution requires channeling of the death-sentencing decision, various Members of this Court have recognized that "the penalty of death is qualitatively different from a sentence of imprisonment, however long." *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion).[9]

---

the furnishing of such other services in accordance with paragrap[h] . . . (8)
. . . .

"(8) Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications, for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant."

[8] *Powell* v. *Alabama*, 287 U. S. 45 (1932), for instance, established a right to appointment of counsel for capital defendants three decades before that right was extended to felony defendants facing imprisonment. *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), overruling *Betts* v. *Brady*, 316 U. S. 455 (1942). See *Hamilton* v. *Alabama*, 368 U. S. 52 (1961) (reversing State's denial of postconviction relief for petitioner who was not represented by counsel at arraignment on capital charge). In *Bute* v. *Illinois*, 333 U. S. 640, 674 (1948), the Court held that a state court was not required to query a defendant in a noncapital case regarding his desire for counsel. "On the other hand," Justice Burton pointed out in the majority opinion, "this Court repeatedly has held that failure to appoint counsel to assist a defendant or to give a fair opportunity to the defendant's counsel to assist him in his defense where charged with a capital crime is a violation of due process of law under the Fourteenth Amendment." *Id.*, at 676 (citing cases).

[9] Among those making this point before *Furman* were Justice Frankfurter in *Andres* v. *United States*, 333 U. S. 740, 753 (1948) (concurring

The unique nature of the death penalty not only necessitates additional protections during pretrial, guilt, and sentencing phases,[10] but also enhances the importance of the appellate process. Generally there is no constitutional right to

opinion) ("The statute reflects the movement, active during the nineteenth century, against the death sentence. The movement was impelled both by ethical and humanitarian arguments against capital punishment, as well as by the practical consideration that jurors were reluctant to bring in verdicts which inevitably called for its infliction"), and again in *Leland* v. *Oregon*, 343 U. S. 790, 803 (1952) (dissenting opinion) ("Even though a person be the immediate occasion of another's death, he is not a deodand to be forfeited like a thing in the medieval law"), and Justice Reed in *Andres, supra,* at 752 (opinion of the Court) ("In death cases doubts such as those presented here should be resolved in favor of the accused").

In 1983, 11 years after *Furman* had been decided, JUSTICE O'CONNOR observed in a majority opinion that the "Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California* v. *Ramos*, 463 U. S. 992, 998–999; see *id.,* at 999, n. 9 (citing cases). See also, *e. g., Ford* v. *Wainwright*, 477 U. S. 399, 411 (1986) (MARSHALL, J., plurality opinion) ("In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. . . . This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different"); *Ake* v. *Oklahoma*, 470 U. S. 68, 87 (1985) (Burger, C. J., concurring in judgment) ("In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases"); *Gardner* v. *Florida*, 430 U. S. 349, 357–358 (1977) (STEVENS, J., plurality opinion) ("From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion").

[10] *E. g., Satterwhite* v. *Texas*, 486 U. S. 249 (1988); *Booth* v. *Maryland*, 482 U. S. 496 (1987); *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985); *Spaziano* v. *Florida*, 468 U. S. 447, 456 (1984); *Beck* v. *Alabama*, 447 U. S. 625 (1980); *Lockett* v. *Ohio*, 438 U. S. 586 (1978) (plurality opinion). Accord, *ante,* at 8–9.

appeal a conviction. See, *e. g.*, *McKane* v. *Durston*, 153 U. S. 684 (1894). "[M]eaningful appellate review" in capital cases, however, "serves as a check against the random or arbitrary imposition of the death penalty." *Gregg* v. *Georgia*, 428 U. S. 153, 195, 206 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.). It is therefore an integral component of a State's "constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey* v. *Georgia*, 446 U. S. 420, 428 (1980).[11]

Ideally, "direct appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception. When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot* v. *Estelle*, 463 U. S. 880, 887 (1983). There is, however, significant evidence that in capital cases what is ordinarily considered direct review does not sufficiently safeguard against miscarriages of justice to warrant this presumption of finality.[12] Federal habeas

---

[11] Accord, *Woodson* v. *North Carolina*, 428 U. S. 280, 303 (1976) (plurality opinion); *Proffitt* v. *Florida*, 428 U. S. 242, 251, 253, 258–259 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.); *Jurek* v. *Texas*, 428 U. S. 262, 276 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.); *Gregg* v. *Georgia*, 428 U. S. 153, 188 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.). Cf. *Ramos*, 463 U. S., at 999; *Zant* v. *Stephens*, 462 U. S. 862, 876 (1983); *Griffin*, 351 U. S., at 21 (Frankfurter, J., concurring in judgment) ("Since capital offenses are *sui generis*, a State may take account of the irrevocability of death by allowing appeals in capital cases and not in others").

[12] Nor can we overlook our experience that capital litigation proceeds apace after affirmance of a conviction. With the vigorous opposition of state legal departments, capital defendants seek not only review of state and federal judicial decisions, but also relief from state governors and parole boards. See Powell, Capital Punishment, 102 Harv. L. Rev. 1035, 1038–1041 (1989). Thus the conviction and sentence in a capital case will not be "final," or undisturbed, until the sentence either is executed or set aside. Cf. *Barefoot* v. *Estelle*, 463 U. S. 880, 888 (1983). With the cases of over half the Nation's more than 2,100 inmates yet to move into collat-

courts granted relief in only 0.25% to 7% of noncapital cases in recent years; in striking contrast, the success rate in capital cases ranged from 60% to 70%.[13]   Such a high incidence of uncorrected error demonstrates that the meaningful appellate review necessary in a capital case extends beyond the direct appellate process.

*Second.*   In contrast to the collateral process discussed in *Finley,* Virginia law contemplates that some claims ordinarily heard on direct review will be relegated to postconviction proceedings.   Claims that trial or appellate counsel provided constitutionally ineffective assistance, for instance, usually cannot be raised until this stage.   See *Frye* v. *Commonwealth,* 231 Va. 370, 345 S. E. 2d 267 (1986).   Furthermore, some irregularities, such as prosecutorial misconduct, may not surface until after the direct review is complete. *E. g., Amadeo* v. *Zant,* 486 U. S. 214 (1988) (prosecutor deliberately underrepresented black people and women in jury pools); *Brady* v. *Maryland,* 373 U. S. 83 (1963).   Occasionally, new evidence even may suggest that the defendant is innocent.   *E. g., Ex parte Adams,* No. 70,787 (Tex. Cr. App., Mar. 1, 1989) (available on Lexis); *McDowell* v. *Dixon,* 858

---

eral proceedings, Wilson & Spangenberg, State Post-Conviction Representation of Defendants Sentenced to Death, 72 Judicature 331, 332 (1989), the need for an orderly sequence of review is pellucid.   As THE CHIEF JUSTICE has remarked: " 'We judges have no right to insist that matters such as these proceed at a leisurely pace, or even at an ordinary pace, but I think we do have a claim to have explored the possibility of imposing some reasonable regulations in a situation which is disjointed and chaotic.' "   Remarks before the National Conference of Chief Justices (Jan. 27, 1988), quoted in Powell, *supra,* at 1040.

[13] Mello, Facing Death Alone: The Post-Conviction Attorney Crisis on Death Row, 37 Am. U. L. Rev. 513, 520–521 (1988).   The former Chief Judge of the Eleventh Circuit, which has the greatest volume of capital litigation, recently estimated that in his Circuit capital defendants' success rate in collateral proceedings may be as high as one-third to one-half of all such cases.   Godbold, *Pro Bono* Representation of Death Sentenced Inmates, 42 Record of N. Y. C. B. A. 859, 873 (1987).   Cf. *Barefoot,* 463 U. S., at 915 (MARSHALL, J., dissenting).

F. 2d 945 (CA4 1988), cert. denied, 489 U. S. 1033 (1989). Given the irreversibility of capital punishment, such information deserves searching, adversarial scrutiny even if it is discovered after the close of direct review.

The postconviction procedure in Virginia may present the first opportunity for an attorney detached from past proceedings to examine the defense and to raise claims that were barred on direct review by prior counsel's ineffective assistance. A fresh look may reveal, for example, that a prior conviction used to enhance the defendant's sentence was invalid, e. g., *Johnson* v. *Mississippi*, 486 U. S. 578 (1988); or that the defendant's mental illness, lack of a prior record, or abusive childhood should have been introduced as evidence in mitigation at his sentencing hearing, e. g., *Curry* v. *Zant*, 258 Ga. 527, 371 S. E. 2d 647 (1988). Defense counsel's failure to object to or assert such claims precludes direct appellate review of them.[14] The postconviction proceeding gives inmates another chance to rectify defaults.[15] In Virginia,

---

[14] The Virginia Supreme Court requires contemporaneous objection before it will consider any asserted trial error on direct review. Va. Sup. Ct. Rule 5:21. Likewise, it does not review the entire case record, but only questions clearly assigned as errors on appeal. See *ibid.*; Va. Code § 17.110.1 (1988). See also *Quintana* v. *Commonwealth*, 224 Va. 127, 295 S. E. 2d 643 (1982), cert. denied, 460 U. S. 1029 (1983).

This Court abides by States' applications of rules precluding direct review of procedurally defaulted claims, see *Caldwell*, 472 U. S., at 327, sometimes in confidence that an obvious error will be corrected on collateral review. *E. g., Watkins* v. *Virginia*, 475 U. S. 1099, 1100 (1986) (opinion of STEVENS, J., respecting the denial of petition for certiorari in 229 Va. 469, 331 S. E. 2d 422 (1985)).

[15] The Virginia Supreme Court will consider previously defaulted claims on postconviction review if the petitioner shows that counsel was ineffective in failing to assert a claim or object to an error. See *Slayton* v. *Parrigan*, 215 Va. 27, 205 S. E. 2d 680 (1974), cert. denied, 419 U. S. 1108 (1975). Failure to do so may forever bar review, for Virginia does not allow a claim that could have been raised in the first postconviction petition to be asserted in a successive petition. Va. Code § 8.01–654(B)(2) (1984). See 847 F. 2d, at 1120, n. 4; *Whitley* v. *Bair*, 802 F. 2d 1487 (CA4 1986), cert. denied, 480 U. S. 951 (1987).

therefore, postconviction proceedings are key to meaningful appellate review of capital cases.

State postconviction proceedings also are the cornerstone for all subsequent attempts to obtain collateral relief. Once a Virginia court determines that a claim is procedurally barred, a federal court may not review it unless the defendant can make one of two difficult showings: that there was both cause for the default and resultant prejudice, or that failure to review will cause a fundamental miscarriage of justice. *Murray* v. *Carrier*, 477 U. S. 478, 485, 495 (1986); *Wainwright* v. *Sykes*, 433 U. S. 72, 87 (1977). If an asserted claim is tested in an evidentiary hearing, the state postconviction court's factual findings may control the scope of a federal court's review of a subsequent petition for a writ of habeas corpus pursuant to 28 U. S. C. § 2254.[16]

Nor may a defendant circumvent the state postconviction process by filing a federal habeas petition. In *Rose* v. *Lundy*, 455 U. S. 509 (1982), this Court held that in order to comply with the exhaustion provision of 28 U. S. C. § 2254(c), federal courts should dismiss petitions containing claims that have not been "fairly presented to the state courts," *Picard* v. *Connor*, 404 U. S. 270, 275 (1971), for both direct and post-conviction review, *Castille* v. *Peoples*, 489 U. S. 346 (1989). Given the stringency with which this Court adheres to procedural default rules,[17] it is of great importance to the prisoner

---

[16] Indeed, if the petitioner is represented by counsel at the hearing, the court's factual findings attain a presumption of correctness that may bar further factual review by the federal court. 28 U. S. C. § 2254(d)(5). See *Sumner* v. *Mata*, 449 U. S. 539 (1981).

[17] See, *e. g.*, *Dugger* v. *Adams*, 489 U. S. 401 (1989) (declining to review claim that jury was instructed inaccurately regarding its role in the capital sentencing process); *Teague* v. *Lane*, 489 U. S. 288 (1989) (holding procedurally barred claim, asserted by petitioner serving life term for murder, that jury was selected in a biased manner in violation of *Swain* v. *Alabama*, 380 U. S. 202 (1965)). See also n. 14, *supra*.

that all his substantial claims be presented fully and professionally in his first state collateral proceeding.[18]

*Third.* As the District Court's findings reflect, the plight of the death row inmate constrains his ability to wage collateral attacks far more than does the lot of the ordinary inmate considered in *Finley*.[19] The District Court found that the death row inmate has an extremely limited period to prepare and present his postconviction petition and any necessary applications for stays of execution. 668 F. Supp. 511, 513 (ED Va. 1986). Unlike the ordinary inmate, who presumably has ample time to use and reuse the prison library and to seek guidance from other prisoners experienced in preparing *pro se* petitions, cf. *Johnson* v. *Avery*, 393 U. S. 483 (1969), a grim deadline imposes a finite limit on the condemned person's capacity for useful research.[20]

Capital litigation, the District Court observed, is extremely complex. 668 F. Supp., at 513. Without regard to the special characteristics of Virginia's statutory proce-

---

[18] The availability of appointed counsel on federal habeas, see n. 7, *supra*, thus presents the specter of a petitioner filing for federal habeas corpus and attaining counsel, only to have the petition dismissed as unexhausted and remanded to state court. Such a haphazard procedure scarcely would serve any interest in finality. It further would raise questions regarding the obligations not only of the appointed counsel to effect exhaustion at the state level, but also of the Federal Treasury to pay for those efforts. Cf. *Ex parte Hull*, 312 U. S. 546, 549 (1941) ("[T]he state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus").

[19] I am at a loss as to why the plurality today prefers to label the District Court findings of fact, based upon trial testimony and post-trial submissions, "'considerations.'" See *ante*, at 4–5, 6.

[20] An execution may be scheduled for any time 30 days after the date of sentencing. Va. Code § 53.1–232 (1988); see 668 F. Supp., at 513. A 1988 study commissioned by the American Bar Association found that *attorneys* spent an average of 992 hours and $3,686 on each capital postconviction proceeding in Virginia. Brief for American Bar Association as *Amicus Curiae* 34 (hereinafter ABA Brief).

dures,[21] this Court's death penalty jurisprudence unquestionably is difficult even for a trained lawyer to master.[22]   A judgment that it is not unfair to require an ordinary inmate to rely on his own resources to prepare a petition for postconviction relief, see *Finley*, 481 U. S., at 557, does not justify the same conclusion for the death row inmate who must acquire an understanding of this specialized area of the law and prepare an application for stay of execution as well as a petition for collateral relief.[23]   This is especially true, the District Court concluded, because the "evidence gives rise to a fair inference that an inmate preparing himself and his family for impending death is incapable of performing the mental functions necessary to adequately pursue his claims."[24]   668 F. Supp., at 513.

---

[21] The District Court commented:

"In Virginia, the capital trial is bifurcated, entailing separate proceedings to determine guilt and to set the appropriate punishment.   Aside from analyzing the voluminous transcript of the guilt determination phase which not infrequently lasts several days, a great deal of time must be devoted to analyzing the issues of mitigation and aggravation characteristic of the sentencing phase of a capital case."   668 F. Supp., at 513.

[22] In apparent recognition of this fact, Congress has required that when a court appoints counsel in capital postconviction proceedings, at least one attorney must have been a member of the bar for at least five years and have at least three years felony litigation experience.   § 7001(b) of the Anti-Drug Abuse Act of 1988, Pub. L. 100–690, 102 Stat. 4394, codified at 21 U. S. C. §§ 828(q)(5), (q)(6) (1988 ed.).

[23] Compounding matters is the typically low educational attainment of prisoners.   In 1982 more than half of Florida's general inmate population was found to be functionally illiterate, while in 1979 the State's death row inmates possessed a ninth-grade mean educational level.   ABA Brief 26–27.   Virginia's death row inmates apparently have similar educational backgrounds.   See Brief for American Civil Liberties Union et al. as *Amici Curiae* 20–21, n. 7.   See also Brief for Maryland State Bar Association et al. as *Amici Curiae* 16–17 (State Bar Brief) (citing similar statistics for other States' inmate populations).

[24] For example, one lawyer testified:

"I have had lots of clients in those last 60 day time periods, and what they are forced to do is to prepare themselves mentally and spiritually and emo-

These three critical factors demonstrate that there is a profound difference between capital postconviction litigation and ordinary postconviction litigation in Virginia. The District Court's findings unequivocally support the conclusion that to obtain an adequate opportunity to present their postconviction claims fairly, death row inmates need greater assistance of counsel than Virginia affords them. Cf. *id.*, at 514–515. Meaningful access, and meaningful judicial review, would be effected in this case only if counsel were appointed, on request, in time to enable examination of the case record, factual investigation, and preparation of a petition containing all meritorious claims, which the same attorney then could litigate to its conclusion.

## III

Although in some circumstances governmental interests may justify infringements on Fourteenth Amendment rights, cf. *Mathews* v. *Eldridge*, 424 U. S. 319, 334–335 (1976), Virginia has failed to assert any interest that outweighs respondents' right to legal assistance. The State already appoints counsel to death row inmates who succeed in filing postconviction petitions asserting at least one nonfrivolous claim; therefore, the additional cost of providing its 32 death row inmates competent counsel to prepare such petitions should be minimal. See 668 F. Supp., at 512, 515. Furthermore, multiple filings delay the conclusion of capital litigation and exacerbate the already serious burden these cases im-

tionally to deal with their family and their children, all of whom see them as about to die. And that is a full time job.

"And very few of them, I think, even have the emotional resources to talk with you meaningfully at that point about their case. Much less to take it over." App. 66.

Cf. *Medley*, 134 U. S. 160, 172 (1890) ("[W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it, which may exist for the period of four weeks, as to the precise time when his execution shall take place").

pose on the State's judicial system and the legal department. It seems obvious that professional preparation of the first postconviction petition, by reducing successive petitions, would result in a net benefit to Virginia.[25]

Of the 37 States authorizing capital punishment, at least 18 automatically provide their indigent death row inmates counsel to help them initiate state collateral proceedings.[26] Thirteen of the 37 States have created governmentally funded re-

---

[25] A representative of the Virginia attorney general's office testified regarding the office's policy not to oppose a death row inmate's motion for appointment of postconviction counsel as follows:

"Well, basically we want to see the inmate have an attorney at State Habeas for reasons of economy and efficiency.

"When you have a death case, we recognize that it is going to be prolonged litigation and we want to see all matters that the inmate or the petitioner wants to raise be raised at one proceeding, and we can deal more efficiently with an attorney. And we prefer that from an economy standpoint we don't have to have more than one proceeding." App. 272.

Cf. Powell, 102 Harv. L. Rev., at 1040 (attributing delay in carrying out capital punishment in part to lack of counsel on collateral review).

[26] Ariz. Rule Crim. Proc. 32.5(b); Cal. Govt. Code Ann. § 15421(c) (West 1980), Cal. Penal Code Ann. § 1240 (West 1982); Conn. Super. Ct. Rules, Criminal Cases § 959, Conn. Gen. Stat. § 51–296(a) (1989); Fla. Stat. § 27.702 (1987); Idaho Code § 19–4904 (1987); Ind. Rule Proc. for Post-Conviction Remedies 1, § 9; Md. Ann. Code, Art. 27, § 645A(f) (Supp. 1988); Mo. Rules Crim. Proc. 24.035(e), 29.15(e); N. J. Rules Governing Criminal Practice 3:22–6, 3:27–1, N. J. Stat. Ann. § 2A:158A–5 (West Supp. 1989–1990); N. C. Gen. Stat. §§ 15A–1421 (1988), 7A–451(a)(2) (Supp. 1988), 7A–486.3 (1986); Okla. Stat., Tit. 22, § 1089 (Supp. 1988); Ore. Rev. Stat. § 138.590(3) (1987); Pa. Rule Crim. Proc. 1503; S. D. Codified Laws § 21–27–4 (1987); Tenn. Sup. Ct. Rule 13, § 1; Utah Rule Civ. Proc. 65B(i)(5); Vt. Stat. Ann., Tit. 13, §§ 5231–5233, 7131 (1974), as interpreted in In re Morse, 138 Vt. 327, 415 A. 2d 232 (1980); Wash. Super. Ct. Crim. Rule 3.1(b)(2).

In addition to these 18 States, 3—Montana, Nevada, and Wyoming— have no definitive case or statutory law on this point but are listed in a 1988 study commissioned by the American Bar Association as having a practice of mandatory appointment of counsel on request. Wilson & Spangenberg, 72 Judicature, at 334 (Table 1).

source centers to assist counsel in litigating capital cases.[27] Virginia is among as few as five States that fall into neither group and have no system for appointing counsel for condemned prisoners before a postconviction petition is filed.[28] In *Griffin*, the Court proscribed Illinois' discriminatory barrier to appellate review in part because many other States already had rejected such a barrier. 351 U. S., at 19; cf. *Gideon*, 372 U. S., at 345 (noting that 22 States supported right to trial counsel). Similarly, the trend in most States to expand legal assistance for their death row inmates further

---

[27] They are Alabama, Arizona, California, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas. State Bar Brief 34. See Mello, 37 Am. U. L. Rev., at 593–606 (discussing development of Florida's resource center); cf. Godbold, 42 Record of N. Y. C. B. A., at 868–871 (state and federal efforts to provide legal assistance). As a result of several studies it has commissioned concerning the significance of providing counsel in capital postconviction proceedings, the American Bar Association "has recognized that the only feasible way to provide death row inmates with meaningful access to the courts is the implementation in each state which imposes capital punishment of a governmentally-funded system under which qualified, compensated attorneys represent death row inmates in state post-conviction proceedings." ABA Brief 4–5.

[28] Of 27 States that responded to a 1988 survey, only Virginia, Nebraska, Pennsylvania, and Nevada were reported to have no system "to monitor and assure that counsel will be provided prior to the filing of a post-conviction petition." Wilson & Spangenberg, *supra*, at 335. Of those, only Virginia and Nevada have executed prisoners since this Court decided *Furman* v. *Georgia*, 408 U. S. 238 (1972). NAACP Legal Defense and Education Fund, Inc., Death Row, U. S. A. 3 (March 1, 1989) (Death Row). Pennsylvania, and perhaps Nevada, appoint counsel automatically upon request. See n. 26, *supra*. Of the 10 States that have death penalty statutes but were not part of the survey, only Arkansas, Colorado, and New Hampshire have neither rules for automatic appointment of counsel nor resource centers. None of these States has conducted a post-*Furman* execution; New Hampshire, in fact, has no prisoner under sentence of death, and Colorado has none whose case has reached the state postconviction stage. Death Row, *supra*, at 1; Wilson & Spangenberg, *supra*, at 334.

di:lutes Virginia's weak justifications for refusing to do so, and "lends convincing support to the conclusion" of the courts below that these respondents have a fundamental right to the relief they seek. See *Powell*, 287 U. S., at 73.

## IV

The basic question in this case is whether Virginia's procedure for collateral review of capital convictions and sentences assures its indigent death row inmates an adequate opportunity to present their claims fairly. The District Court and Court of Appeals en banc found that it did not, and neither the State nor this Court's majority provides any reasoned basis for disagreeing with their conclusion. Simple fairness requires that this judgment be affirmed.

I respectfully dissent.