[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
APRIL 19, 2012
JOHN LEY

No. 10-14978

D.C. Docket No. 5:09-cv-00261-RS

JEFFREY GLENN HUTCHINSON,

Petitioner - Appellant,

versus

STATE OF FLORIDA,

Respondent - Appellee.

Appeal from the United States District Court
for the Northern District of Florida

(April 19, 2012)

Before EDMONDSON, CARNES, and BARKETT, Circuit Judges.

CARNES, Circuit Judge:

This is another federal habeas statute of limitations case, involving another equitable tolling issue. See generally 28 U.S.C. § 2244(d); Holland v. Florida, __ U.S. __, 130 S.Ct. 2549 (2010). Jeffrey G. Hutchinson was convicted of four counts of first degree murder for shotgunning to death his girlfriend, Renee Flaherty, and her three children: nine-year-old Geoffrey, seven-year-old Amanda, and four-year-old Logan. Hutchinson v. State, 882 So. 2d 943, 948–49 (Fla. 2004) abrogated by Deparvine v. State, 995 So. 2d 351 (Fla. 2008). He was sentenced to life imprisonment for the murder of Renee Flaherty and to death for the murder of each child. Id. at 949. His convictions and sentences were affirmed on direct appeal. Id. at 961. After an evidentiary hearing state collateral relief was denied, and that denial was affirmed by the Florida Supreme Court. Hutchinson v. State, 17 So. 3d 696, 702–04 (Fla. 2009).

The district court dismissed Hutchinson's 28 U.S.C. § 2254 petition for federal habeas relief because it was not filed until July 24, 2009, which was three years, nine months, and twenty-four days (or 1,393 days) after the one-year statute of limitations contained in § 2244(d) had run on September 30, 2005. Hutchinson v. Florida, No. 5:09-CV-261-RS, 2010 WL 3833921 (N.D. Fla. Sept. 28, 2010). This is Hutchinson's appeal from that dismissal.

2

Under § 2244(d)(1)(A) the one-year period for filing a federal habeas petition starts running on the date "on which the [state court] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." But § 2244(d)(2) provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted." In order for that § 2244(d)(2) statutory tolling to apply, the petitioner must file his state collateral petition before the one-year period for filing his federal habeas petition has run. McCloud v. Hooks, 560 F.3d 1223, 1227 (11th Cir. 2009); Alexander v. Sec'y, Dep't of Corr., 523 F.3d 1291, 1294 (11th Cir. 2008) abrogated on other grounds by Wall v. Kholi, __ U.S. __, 131 S.Ct. 1278 (2011); see also Hunter v. Ferrell, 587 F.3d 1304, 1308 n.3 (11th Cir. 2009). Hutchinson's state collateral petition was not filed until October 20, 2005, which was twenty days after the entire one-year period for filing the federal petition had run on September 30, 2005, and as a result none of the limitations period for filing his federal petition was left to be tolled. From that point on Hutchinson's hopes for relief were riding all or nothing on his state collateral petition, and the result came up nothing when the Florida Supreme Court affirmed the denial of collateral relief. See Hutchinson, 17 So. 3d at 702–04.

3

Hutchinson recognizes both that his federal habeas petition should have been filed by September 30, 2005, and that because his state collateral petition was not filed until October 20, 2005, he cannot claim statutory tolling under § 2244(d)(2) for any of the time that his state collateral proceeding was ongoing. His sole contention is that he is entitled to equitable tolling. See generally Holland, 130 S.Ct. 2549. Equitable tolling is, well, equitable in nature, and decisions regarding it must be made "on a case-by-case basis" in light of "specific circumstances, often hard to predict in advance," although we "can and do draw upon decisions made in other similar cases for guidance." Id. at 2563 (quotation marks omitted). We turn now to the specific facts and circumstances of this case as well as to the decisions in similar cases for guidance.

The parties agree that the problem in this case arose because the attorneys who filed Hutchinson's state collateral petition misunderstood the date on which the limitations period began to run at the end of the direct appeal process and, as a result, they miscalculated the filing deadline. Because no petition for writ of certiorari was filed in the United States Supreme Court as part of the direct appeal, the time for filing the federal habeas petition started running upon "the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Hutchinson's attorneys understood that, but they misunderstood when the time for seeking

4

certiorari review of a state court's judgment expired. They thought that the time for doing so expired ninety days after the Florida Supreme Court issued its mandate on July 22, 2004. See App. A ¶ 2. Instead, the time actually expired ninety days after the issuance of the Florida Supreme Court's judgment (the opinion was the judgment), which had happened twenty-one days earlier on July 1, 2004. See Sup. Ct. R. 13.3 ("The time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate (or its equivalent under local practice).").

As a result of that misunderstanding, Hutchinson's attorneys miscalculated the deadline by which they were required to file either Hutchinson's federal habeas petition or file his state collateral petition in time to statutorily toll the federal limitations period. They believed that they had until October 20, 2005, instead of September 30, 2005, which was the actual deadline.[1] Because they filed Hutchinson's state collateral petition on October 20, 2005, the § 2244(d)(2) tolling provision did not kick in and when Hutchinson finally filed his federal habeas petition on July 24, 2009, it was three-and-three-quarters years too late.

---

[1] By our calculations, the actual deadline should have been September 29, 2005, because that is one year after September 29, 2004, the date on which the judgment of the state court became final under § 2244(d)(1)(A). For some reason, the district court said and the parties say that the deadline was September 30, 2005. Because the difference makes no difference we will use the September 30, 2005 date, too.

A petitioner has the burden of establishing his right—if "right" is not too strong a word in the area of equity—to equitable tolling. He must plead or proffer enough facts that, if true, would justify an evidentiary hearing on the issue. Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). And the allegations supporting equitable tolling must be specific and not conclusory. Id. at 1061. The Supreme Court did say in Holland that although equitable relief is flexible and all the facts and circumstances must be considered, we should "draw upon decisions made in other similar cases for guidance." Holland, 130 S.Ct. at 2563. We take that statement to mean this is not an area free of rules of law, governed entirely by the chancellor's foot, but we are instead bound by precedent to the extent that there is precedent.[2]

---

[2]And it is a good thing that rules of precedent apply here. Even Blackstone, who was something of a fan of equity, warned that:

> [T]he liberty of considering all cases in an equitable light, must not be indulged too far; lest thereby we destroy all law, and leave the decision of every question entirely in the breast of the judge. And law, without equity, though hard and disagreeable, is much more desirable for the public good, than equity without law: which would make every judge a legislator, and introduce most infinite confusion; as there would then be almost as many different rules of action laid down in our courts, as there are differences of capacity and sentiment in the human mind.

1 William Blackstone, Commentaries *62; see also 1 Joseph Story, Commentaries on Equity Jurisprudence § 19, at 16 (13th ed. 1886) ("If indeed, a Court of Equity in England did possess the unbounded jurisdiction which has been thus generally ascribed to it . . . it would be the most gigantic in its sway, and the most formidable instrument of arbitrary power, that could well be devised.").

Binding precedent has laid down two requirements that a federal habeas petitioner must meet before a court can grant him equitable tolling of the § 2244(d) statute of limitations. In the Supreme Court's words: "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Holland, 130 S.Ct. at 2562 (quotation marks omitted); Lawrence v. Florida, 549 U.S. 327, 336, 127 S.Ct. 1079, 1085 (2007); see also Chavez, 647 F.3d at 1066, 1068. The Supreme Court has also instructed us that "a garden variety claim of excusable neglect such as a simple miscalculation that leads a lawyer to miss a filing deadline does not warrant equitable tolling." Holland, 130 S.Ct. at 2564 (citation and quotation marks omitted); Lawrence, 549 U.S. at 336–37, 127 S.Ct. at 1085 ("Attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel."); see also Chavez, 647 F.3d at 1066.

This case involves, in Holland's language, "a garden variety claim of excusable neglect," arising from "a simple miscalculation that leads a lawyer to miss a filing deadline." See Holland, 130 S.Ct. at 2564 (quotation marks omitted). The attorneys who filed the state collateral petition for Hutchinson misunderstood

7

what § 2244(d)(1)(A)'s "expiration of the time for seeking such review" meant when read against Supreme Court Rule 13.3. The fact that they ought to have known better does not justify equitable tolling.[3] The attorneys who miscalculated the deadline for filing in the Lawrence case did so because they were not aware of well-settled law that should have prevented any confusion on their part. See Lawrence, 549 U.S. at 336–37, 127 S.Ct. at 1085. Yet, the Supreme Court still held that equitable tolling was not justified in that case because "[a]ttorney miscalculation is simply not sufficient to warrant equitable tolling." Id. at 336, 127 S.Ct. at 1085. If attorney miscalculation, error, or negligence were enough for equitable tolling, the § 2244(d) statute of limitations would be tolled to the brink of extinction because in practically every case where there is a failure to meet the

---

[3]Any implicit criticism by us of Hutchinson's attorneys for their mistake is tempered by awareness that a panel of this Court made exactly the same mistake a year-and-a-half before those two attorneys did. The opinion in Diaz v. Secretary for the Department of Corrections, 362 F.3d 698 (11th Cir. 2004), states that "[t]he 90-day period in which Diaz could have filed a petition in the United States Supreme Court expired on June 19, 1997, at which time the clock began to run on the one-year limitation for the filing of habeas petitions." Id. at 699. The opinion in that case shows, however, that June 19, 1997 was 90 days after the state appellate court's mandate had issued and not 90 days after its opinion had issued, which was 16 days earlier. See id. We do not know if the Diaz opinion confused Hutchinson's counsel or if they were even aware of it. What we do know is that no one is perfect; we all make mistakes.

filing deadline an attorney is at fault. See Chavez, 647 F.3d at 1071 ("In virtually every case where the issue of equitable tolling comes up one or more attorneys should have acted with more dispatch, but more than that is required.").

Hutchinson argues that more is involved here than simple attorney error or miscalculation. The "more" that he contends is involved is set out in the affidavit that he filed in the district court in response to the motion to dismiss his federal habeas petition as untimely. (That affidavit is reproduced in full as Appendix A to this opinion.) In his affidavit, Hutchinson states that he repeatedly expressed to the two attorneys who were representing him his concern about the statute of limitations, and on September 22, 2005 he told them "point blank and in no uncertain terms to 'either file my rule 3.851 motion immediately or I will discharge you and file it myself.'" App. A ¶ 15. On that occasion, Hutchinson recounts, both attorneys promised him that they "would file the motion on or before September 28, 2005, though they went on to say that we had 90 days after the mandate was issued by the Florida Supreme Court, so the rule 3.851 motion was not actually due until 'October 20th.'" Id. According to Hutchinson, he again told his two attorneys that if they did not file the Rule 3.851 motion "immediately" he would file it himself because he knew that was "the only way [he] could prevent the one-year limitations period from expiring on [his] 2254 petition." Id.

9

The attorneys "guaranteed" him that they would file the state court motion "no later than September 28, 2005." Id. But they did not do that. Instead, they filed the state court motion on October 20, 2005.[4]

Hutchinson alleges that but for his attorneys' promise to file by September 28, 2005 he "would have discharged them and filed a pro se rule 3.851 motion to prevent 28 U.S.C. § 2255(d)(1)'s [sic] one-year limitations period from expiring." App. A ¶ 16. He attached to his affidavit "facsimiles of the Notice of Pro Se Status and Rule 3.851 Motion that [he] would have filed on September 23, 2005, but for [the attorneys'] promise." Id. Those two facsimiles are each dated September 23, 2005 and signed by Hutchinson, indicating that he was ready, willing, and able to file his motion to proceed pro se and his Rule 3.851 motion on or soon after that date and would have done so but for his attorneys' promises,

---

[4]In his affidavit Hutchinson states that before the statute of limitations ran he met with attorney Brody three times, App. A ¶¶ 7, 10, 12, with attorney Hazen four times, id. ¶¶ 6, 8, 11, 13, and with both of them on two other occasions, id. ¶¶ 14, 15. He states that during one of his meetings with Brody alone, more than five months before the limitations period ran, Brody was "visibly disoriented and smelled strongly of alcohol," id. ¶ 12, and during another meeting two-and-a-half months before the limitations period ran Brody was "sweating profusely and smelled of alcohol," id. ¶ 14. Hutchinson also says that on that later occasion Hazen told him that Brody was "just having a lot of personal problems." Id. But there is no allegation that Brody's impairment, if any, caused the error in miscalculating the due date. See Chavez, 647 F.3d at 1071 (holding that equitable tolling was not appropriate where "[t]here are . . . no allegations at all that [state post-conviction counsel's] health had affected his ability to handle the case up to the time he withdrew or that it had prevented him from filing the motion for state post-conviction relief sooner"). Nor has Hutchinson alleged that attorney Hazen, who actually signed and filed the Rule 3.851 motion in state court on October 20, 2005, was ever impaired in any way.

which were not kept.[5]

Hutchinson knew, at least by October 19, 2005, that his attorneys had not filed his state Rule 3.851 motion by the September 30, 2005 deadline (or the September 28, 2005 deadline, as he had calculated it). We know that Hutchinson knew that because October 19, 2005 is the date Hutchinson signed, under penalty of perjury, the verification on the Rule 3.851 motion (which one of the attorneys filed in state court the next day).[6] Just twenty-seven days earlier he had told his two attorneys that filing the Rule 3.851 motion in state court by September 28, 2005 was necessary to prevent the federal filing deadline from expiring. See App.

---

[5]Hutchinson's affidavit also states that on three occasions, the last of which was July 14, 2005, he asked his attorneys to file a "shell-brief" in state court in order to prevent the time from running while they investigated his case and prepared the real motion for state collateral relief. App. A ¶¶ 11, 13, 14. But attorney Hazen told him then that a state court "shell brief didn't provide the protection that it used to." Id. ¶ 11. It appears that Hazen was correct about that. The respondent's brief in this case informs us that in 2001 Florida's Rule 3.851 was amended to prohibit the filing of shell motions, see Fla. R. Crim. P. 3.851(e)(1)(D), Gonzalez v. State, 990 So. 2d 1017, 1034 & n.9 (Fla. 2008), and that shell motions are stricken by the Florida courts and no longer can be used to meet filing deadlines. In his reply brief, Hutchinson does not take issue with any of that information.

[6]Although Hutchinson's affidavit and the date of his signature on the federal habeas petition establish beyond dispute that he knew his attorneys had missed the deadline for filing his state petition, our separately writing colleague asserts that Hutchinson had no reason to file his federal habeas petition until nearly four years later because he relied on his attorneys' assurances that they were doing what was necessary to protect his federal habeas rights. See Concurring Op. at 25–26. That assertion is belied by Hutchinson's own sworn statements, which establish that he knew his attorneys had missed the deadline, yet for years after realizing that he still made no attempt to file in federal court the collateral petition he had already drafted. However judges may feel about the law applicable to this or any other area, we have no license to rewrite the facts of a case.

11

A ¶ 15. And Hutchinson had already drafted, dated, and had ready to file a complete petition setting out all of the claims that he wanted to raise. Id. ¶¶ 15–16. By simply changing the name of the court in which that petition was to be filed, Hutchinson himself could have filed his federal habeas petition on or soon after October 20, 2005, which would have been just twenty days after the expiration of the one-year limitations period.[7]

Yet Hutchinson did nothing of the sort for nearly four years. He did not file his pro se habeas petition in federal court until July 24, 2009, which was long after the state trial court had denied his Rule 3.851 motion on January 3, 2008, and was also after the Florida Supreme Court had affirmed that denial on July 9, 2009.

---

[7]Had Hutchinson done so, the federal district court could have held his federal habeas petition in abeyance until his efforts to secure state collateral relief were completed. See Rhines v. Weber, 544 U.S. 269, 278–79, 125 S.Ct. 1528, 1535 (2005). Our colleague's suggestion that a district court might dismiss such a petition without abusing its discretion is contradicted by the only authority she cites for that proposition, which is the Rhines decision. See Concurring Op. at 26 n.21. The Supreme Court stated in Rhines that:

> [I]t likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics. In such circumstances, the district court should stay, rather than dismiss, the mixed petition. See Lundy, 455 U.S., at 522, 102 S.Ct. 1198 (the total exhaustion requirement was not intended to "unreasonably impair the prisoner's right to relief"). In such a case, the petitioner's interest in obtaining federal review of his claims outweighs the competing interests in finality and speedy resolution of federal petitions.

Rhines, 544 U.S. at 278, 125 S.Ct. at 1535.

More to the point, Hutchinson waited to file his federal petition for three years, nine months and five days—a total of 1,374 days—after he learned on October 19, 2005 that his attorneys had missed the deadline for a filing in state court that would have tolled the federal limitations period. There is nothing in Hutchinson's affidavit or in his briefs to explain his delay of nearly four years. Nothing.

We need not decide whether Hutchinson has established that an extraordinary circumstance stood in the way of his meeting the § 2244(d) filing deadline, because he has not carried his burden of showing that he pursued his rights diligently. See Holland, 130 S.Ct. at 2562; Lawrence, 549 U.S. at 336, 127 S.Ct. at 1085; see also Chavez, 647 F.3d at 1066, 1068. Although Hutchinson's affidavit may show that he diligently attempted to have his state collateral motion filed in time to give him the benefit of § 2244(d) statutory tolling, it does not show that once that opportunity was missed he pursued his federal rights diligently. Instead, his affidavit and the other materials he has submitted show that he had in hand a petition that he could have re-labeled and filed pro se in federal court within three weeks after the one-year limitations period ran, but he waited three-and-three-quarter years before he filed a pro se federal habeas petition. That is not reasonable diligence.

Hutchinson's lengthy delay in filing his pro se federal habeas petition stands

13

in stark contrast to the petitioner's diligence in the <u>Holland</u> case. The Supreme Court stressed that "the *very day* that Holland discovered that his AEDPA clock had expired due to [his attorney's] failings, Holland prepared his own habeas petition <u>pro</u> <u>se</u> and promptly filed it with the District Court." <u>Holland</u>, 130 S.Ct. at 2565 (emphasis in original). Holland's filing of his federal habeas petition the day after he learned that "his AEDPA clock had expired due to [his attorney's] failings" may be "maximum feasible diligence," <u>id.</u>, which is not required. But Hutchinson's failure to do anything to get his federal habeas petition filed for nearly four years after he learned that the AEDPA clock had run out due to his attorneys' miscalculation is not even "reasonable diligence," which is required, <u>id.</u>

The district court did not err in concluding that Hutchinson was not entitled to equitable tolling of 1,393 days.

**AFFIRMED.**

BARKETT, Circuit Judge, concurring in the result only:

Initially, I disagree with the majority's holding that Hutchinson was not reasonably diligent in pursuing his claims. He did everything any reasonable client would do to assure that his lawyers protected his interests, including imploring his lawyers to file his post-conviction pleadings in a timely manner. The majority's suggestion that Hutchinson should have filed a placeholder pro se habeas petition is simply not logical when Hutchinson was represented by lawyers who were assuring him that his claims were being pursued.

However, no matter how diligent Hutchinson was or could have been, as the law stands today, this Court still could not grant Hutchinson the relief of equitable tolling because the Supreme Court has held that, notwithstanding his diligence, a defendant is responsible for and must bear the consequences of his lawyer's negligence.[1] See Lawrence, 549 U.S. at 336–37; Coleman v. Thompson, 501 U.S. 722, 753–54 (1991); see also Martinez v. Ryan, 566 U.S. ___, ___ (2012) (slip op., at 7); Holland, 130 S. Ct. at 2563.

The holdings of Lawrence and Coleman are premised on the continued

---

[1] In order to merit equitable tolling, a petitioner must establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Holland v. Florida, 560 U.S. ___, ___,130 S. Ct. 2549, 2562 (2010) (internal quotation marks omitted). A lawyer's negligence does not constitute an "extraordinary circumstance." See id. at 2564 (citing Lawrence v. Florida, 549 U.S. 327, 336 (2007)). Here, where Hutchinson's lawyers negligently filed his state post-conviction petition too late to statutorily toll the federal habeas filing deadline, their negligence does not constitute an "extraordinary circumstance."

application to death row inmates of the agency theory of the lawyer-client relationship. See, e.g., Maples v. Thomas, 565 U.S. ___, ___, 132 S. Ct. 912, 922 (2012) (explaining that Coleman's holding was based on "well-settled principles of agency law" that "the principal bears the risk of negligent conduct on the part of his agent."). However, as amplified below, none of the key assumptions underlying the application of an agency relationship to a death-sentenced client and his lawyer are valid in the post-conviction context.[2] When the law already recognizes equitable exceptions to holding a client responsible for his lawyer's actions under circumstances with less drastic consequences, an exception should also be made for death row inmates so that their lawyer's negligence does not preclude federal review of constitutional claims.

## I. Agency Principles and Death Row Inmates

An agency relationship exists to permit one person to act on behalf of another.[3] Generally the principal chooses an agent to act on his behalf for a

---

[2] See Adam Liptak, Foreword, Agency and Equity: Why do we blame clients for their lawyers' mistakes?, 110 Mich. L. R. 875, 875 (2012) (stating that "clients and lawyers fit the agency model imperfectly. Agency law is built on the concepts of free choice, consent, and loyalty, and it is not unusual to find lawyer-client relationships in which some or all of these elements are missing.").

[3] See 1 Floyd R. Mechem Treatise on the Law of Agency § 80 (2d ed. 1914) ("It is the general rule that an agency may be created for the performance of any lawful act, and that whatever a person may lawfully do, if acting in his own right and in his own behalf, he may lawfully delegate to an agent.").

specific purpose,[4] and in a traditional lawyer-client relationship, a client hires a lawyer to represent him in a discrete legal matter. The legitimacy of transferring responsibility for the lawyer's negligence from the lawyer to the client is based on several assumptions that underpin the agency relationship. First, it is assumed that the client voluntarily chooses his lawyer for competence, diligence, and loyalty.[5] Second, it is assumed that the client has the ability to direct the actions of the lawyer[6] or, at the very least, that constant and adequate opportunities exist for communication between the client and his lawyer.[7]

But these assumptions do not apply to inmates on death row, almost all of whom do not choose their lawyers. Instead they must depend on appointed or pro bono volunteer counsel who too often lack expertise in post-conviction death penalty representation. See, e.g., Maples, 132 S. Ct. at 918. Consequently, the representation provided in state and federal post-conviction proceedings is too

---

[4] See Restatement (Second) of Agency § 1 (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.").

[5] See Model Rules of Prof'l Conduct R. 1.1, 1.3 (2009).

[6] See id. R. 1.2(a).

[7] See id. R. 1.4.

17

often inadequate.[8] For example, former Florida Supreme Court Justice Raul Cantero stated that "some of the [appointed] counsel have little or no experience in death penalty cases. They have not raised the right issues . . . [and] [s]ometimes they raise too many issues and still haven't raised the right ones."[9] Florida Supreme Court Justice Barbara Pariente has also stated that "[a]s for [appointed] counsel, we have observed deficiencies and we would definitely endorse the need for increased standards for [appointed] counsel, as well as a continuing system of

---

[8] See Jordan M. Steiker, Improving Representation in Capital Cases: Establishing the Right Baselines in Federal Habeas to Promote Structural Reform Within States, 34 Am. J. Crim. L. 293, 297–300 (2007) (discussing the "crisis" in the quality of representation in both the trial and post-conviction stages of capital cases); see also Jon B. Gold & Lisa Greenman, Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases 87–88 (2010) (discussing repercussions of inadequate representation in federal habeas context); American Bar Association, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Alabama Death Penalty Assessment Report 97 (June 2006) ("Although anecdotes about inadequate defenses long have been part of trial court lore, a comprehensive 2000 study shows definitively that poor representation has been a major cause of serious errors in capital cases as well as a major factor in the wrongful conviction and sentencing to death of innocent defendants."); American Bar Association, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Georgia Death Penalty Assessment Report iii (January 2006) ("The State of Georgia is virtually alone in not providing indigent defendants sentenced to death with counsel for state habeas proceedings. The lack of counsel on state habeas . . . creates a situation where this critical constitutional safeguard is so undermined as to be ineffective."); American Bar Association, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Florida Death Penalty Assessment Report iv (September 2006) ("Florida's statutory qualification requirements for capital collateral registry attorneys fall short of the requirements of the ABA Guidelines . . . and are insufficient to ensure qualified counsel for every death-sentenced inmate.").

[9] See Marc Caputo, Justice Blasts Lawyers Over Death Row Appeals, Miami Herald, Jan. 28, 2005, at 1B.

18

screening and monitoring to ensure minimum levels of competence."[10] Likewise, Alabama's death row representation suffers from the same problems. The Supreme Court noted that not only does Alabama set "low eligibility requirements for lawyers appointed to represent indigent capital defendants at trial," Maples, 132 S. Ct. at 917, it is "[n]early alone" in not "guarantee[ing] representation to indigent capital defendants in post-conviction proceedings," id. at 918. Instead, Alabama primarily relies on the efforts of out-of-state volunteer lawyers to handle post-conviction representation. Id.

The agency analogy also breaks down because death row inmates have a limited ability to communicate with their lawyers.[11] Prisons are often located in far-flung places that are difficult for lawyers to reach and often the lawyers are not even located within the same state as their death row clients. Additionally, inmates have restricted access to phones, the internet, and law libraries. In Lawrence and Holland, it was the lack of access to word processing systems and a

---

[10] See Gary Blakenship, Registry Lawyers Defended at Committee Meeting, Fla. Bar News, April 1, 2005, at 5.

[11] "[A] habeas petitioner's limited ability to communicate with the outside world is a barrier to his ability to diligently request information from, or monitor the conduct of, his defaulting attorney." See Marni von Wilpert, Comment, Holland v. Florida: A Prisoner's Last Chance, Attorney Error, and the Antiterrorism and Effective Death Penalty Act's One-Year Statute of Limitations Period for Federal Habeas Corpus Review, 79 Fordham L. Rev. 1429, 1469 (2010).

19

law library that hampered the petitioners' ability to communicate with their attorneys. See Brief for Petitioners at 11 n.25, Lawrence, 549 U.S. 326 (No. 05-8820); Petitioner's Brief on the Merits at 2 n.1., Holland, 130 S. Ct. 2549 (No. 09-5327). In Alabama, death row inmates' phone calls are limited to twenty-five minutes, with prison officials determining the schedule and frequency of phone conversations.[12] According to Georgia's inmate orientation handbook, phone calls in Georgia prisons are limited to fifteen minutes.[13]

Moreover, if a death row inmate is held in a super-maximum security prison or a segregation housing unit ("SHU"), which most are, these barriers may be even more difficult to overcome. First, access to basic reading and writing materials may be entirely restricted, depending on how much of a security threat the inmate is deemed to be. See, e.g., Beard v. Banks, 548 U.S. 521 (2006) (upholding prison regulation that denies access to written material to violent inmates). Second, communication with the outside world becomes even more challenging and more restricted. "In virtually every state, death-row inmates are 'locked down' in their cell for most of the day, have little or no access to educational or other prison

---

[12] Alabama Department of Corrections, Inmate Telephone System Admin. Reg. 431 § V(K) (2005).

[13] Georgia Department of Corrections, Orientation Handbook for Offenders 64, available at http://www.dcor.state.ga.us/pdf/GDC_Inmate_Handbook.pdf.

20

programs, and experience great isolation and loss of relationships."[14] As Justice

Kennedy has observed, "incarceration at [a super-maximum security prison] is

synonymous with extreme isolation." Wilkinson v. Austin, 545 U.S. 209, 214

(2005). Finally, the psychological effects of spending extended periods in solitary

confinement—commonly known as SHU syndrome—may impair an inmate's

mental capabilities to the extent that his active participation in litigation becomes

impossible.[15]

Finally, even if death row inmates were given the ability to access their

attorneys without these formidable obstacles, most death row inmates lack the

skills and intellect to supervise, direct or police the activities of their lawyers in

the way that the agency paradigm assumes. "Capital inmates almost uniformly are

indigent, and often illiterate and uneducated."[16] The dangers of these

shortcomings are all the more pronounced in the context of federal habeas

---

[14] John H. Blume, Killing the Willing: "Volunteers," Suicide and Competency, 103 Mich. L. Rev. 939, 966 (2004).

[15] See generally Craig Haney, Mental Health Issues in Long-term Solitary and "Supermax" Confinement, 49 Crime & Delinq. 124, 130-141 (2003) (describing the SHU syndrome and the long-term effects of solitary confinement on prison inmates); Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash U. J.L. & Pol'y 325, 333–45 (2006) (same); see also Miller ex. rel. Jones v. Stewart, 231 F.3d 1248, 1252 (9th Cir. 2000) ("[I]t is well accepted that conditions such as those present in SMU II . . . can cause psychological decompensation to the point that individuals may become imcompetent.").

[16] Roscoe C. Howard, Jr., The Defunding of the Post Conviction Defense Organizations as a Denial of the Right to Counsel, 98 W. Va. L. Rev. 863, 902 (1996).

proceedings, "the unique and complex nature" of which the Supreme Court has long recognized. See McFarland v. Scott, 512 U.S. 849, 855 (1994). "[T]he complexity of our jurisprudence in this area makes it unlikely that capital defendants will be able to file successful petitions for collateral relief without the assistance of persons learned in the law." Id. at 855–56 (internal alterations omitted); quoting Murray v. Giarratano, 492 U.S. 1, 28 (1989) (Kennedy, J., joined by O'Connor, J., concurring in judgment); see also id., at 28 (Stevens, J., joined by Brennan, Marshall, and Blackmun, JJ., dissenting) ("[T]his Court's death penalty jurisprudence unquestionably is difficult even for a trained lawyer to master."). Given its acknowledgment of the challenges habeas proceedings present to lawyers, it is not surprising that the Supreme Court recently noted in Martinez, supra, at ___ (slip op., at 9), that "[t]he prisoner, unlearned in the law, may not comply with the State's procedural rules or may misapprehend the substantive details of federal constitutional law." Although Martinez dealt specifically with the ability of a prisoner to pursue a post-conviction petition in state court, there can be no doubt that the same limitations are present in the federal post-conviction context as well.[17]

---

[17] See Halbert v. Michigan, 545 U.S. 605, 621 (2005) ("Sixty-eight percent of the state prison population did not complete high school, and many lack the most basic literacy skills. . . . Seven out of ten inmates fall in the lowest two out of five levels of literacy–marked by an

Moreover, a habeas petitioner is not permitted to interfere with his lawyer's determinations regarding which claims to raise. See Jones v. Barnes, 463 U.S. 745, 751 (1983). Even if a client wanted to correct his lawyer's mistakes, he would not be entitled to do so. A prisoner does not have a right to file pro se pleadings while represented by counsel. See United States v. Gwiazdzinski, 141 F.3d 784, 787 (7th Cir. 1998). Courts routinely decline to consider pro se pleadings when an inmate is represented by counsel. See Downs v. McNeil, 520 F.3d 1311, 1324 (11th Cir. 2008) ("[E]ven a savvy petitioner, who may see the clock running out on his habeas time, can only cajole [or] plead with his counsel to file the petition timely.") (citations omitted); see also 11th Cir. R. 25-1 ("When a party is represented by counsel, the clerk may not accept filings from the party.").[18]

These many obstacles render the principal-agent relationship inapplicable in

---

inability to do such basic tasks as write a brief letter to explain an error on a credit card bill, use a bus schedule, or state in writing an argument made in a lengthy newspaper article.") (internal alterations and citations omitted).

[18] See also S.D. Fla. R. 7.7 ("Any party represented by an attorney shall not: (a) address or present to the Court in the form of a letter or the like any application requesting relief in any form, citing authorities, or presenting arguments: and (b) shall not furnish the Court with copies of correspondence between or among counsel, or any party represented by an attorney."); N.D. Fla. R. 7.1 (F) (same); M.D. Fla. R. 2.03(d) ("Any party for whom a general appearance of counsel has been made shall not thereafter take any step or be heard in the case in proper person, absent prior leave of Court.").

the post-conviction context. An inmate's inability to supervise and control the actions of his lawyer makes this relationship far more akin to the paradigm of an independent contractor than a traditional agency relationship.[19] The negligent acts of an independent contractor, unlike those of an agent, are not imputed to the employer for the very reason that the employer lacks the power to meaningfully supervise the contractor.

The reality of the quality of post-conviction death penalty representation available to indigent inmates on death row does not meet the Supreme Court's recognition that Congress intended these inmates to have access to "quality legal representation" when it mandated the statutory right to counsel. McFarland 512 U.S. at 856, 859 ("[F]ederal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty."); see also 18 U.S.C. § 3599(a)(2), (d) (2006) (recodification of 21 U.S.C. §§ 848(q)(4)-(10) (1988)). Congress provided for a statutory right to qualified counsel in federal habeas proceedings in light of the "seriousness of the possible penalty . . . and the unique and complex nature of the litigation." 18 U.S.C. § 3599(d). Indeed, the Supreme Court, recognizing the complexity of federal habeas proceedings, held that the statutory right to counsel must begin even prior to the filing of a

---

[19] See W. Page Keeton et al., Prosser and Keeton on Torts § 71 (5th ed. 1984).

24

federal habeas petition. McFarland, 512 U.S. at 855.

The circumstances surrounding Hutchinson's lawyers' negligent filing of his state post-conviction motion in this case illustrate the difficulties faced by a death row inmate who attempts to work diligently with his lawyers. While on death row, Hutchinson maintained communication—to the best of his ability—with his lawyers and repeatedly asked them to timely file his state post-conviction motion so as to toll the filing deadline for his federal habeas petition.[20] Even the majority recognizes that Hutchinson was reasonably diligent up to the time that his lawyers filed his motion for state post-conviction relief. What other steps could Hutchinson reasonably have taken? Should he not have trusted his lawyers when they assured him they were aware of and would comply with all filing deadlines? There is certainly no expectation that a civil client will shadow his lawyer's every move to ensure that all deadlines are met and all filings are in order. On the contrary, a represented client has every right to assume that his lawyer will competently discharge his duties.

Nonetheless, the majority concludes that Hutchinson was not reasonably

---

[20] The fact that Hutchinson signed the Rule 3.851 motion on October 19, 2005 does not establish beyond dispute that he knew that his attorneys had missed the deadline for filing his state petition. Although Hutchinson kept asking his lawyers to file his state petition, there is nothing to indicate that he knew the precise deadline. It is equally consistent with the facts to believe that he simply wanted his state petition filed and later accepted his attorneys' advice that the deadline was October 20, 2005.

25

diligent because he should have filed a pro se federal habeas petition and asked to have it held in abeyance until his efforts to secure state collateral relief were completed. This course of action surely cannot be required of a client when he has legal representation.[21] A reasonable prisoner would have no cause to file his own pleadings for the simple reason that it is assumed that it is his lawyer's job to do so. Especially here, where Hutchinson's lawyers repeatedly assured him that they would file on time, Hutchinson had no reason to pursue an alternative avenue of relief. Reasonably relying on his lawyers' assurances that they were doing what was necessary to protect his federal habeas rights, Hutchinson did not file a pro se federal habeas petition until it was too late.

---

[21] Indeed, there is no guarantee that such a placeholder petition would be accepted by the federal district court. See Rhines v. Weber, 544 U.S. 269, 277 (2005) ("[S]tay and abeyance should be available only in limited circumstances . . . and is only appropriate when the district court determines there was good cause for the petitioner's failure to present his claims first to the state courts."). In a concurring opinion with the judgment in Rhines, Justice Stevens, with whom Justices Ginsburg and Breyer joined, observed that conditioning the stay-and-abeyance procedure on "good cause" instead of simply on a lack of "intentionally dilatory litigation tactics" left open the door for "[t]he trickiness of some exhaustion requirements to infect issues of good cause . . . ." Id. at 279. Moreover, Rhines concerned an issue distinct from the case at hand in which some habeas corpus claims had been exhausted in state court and others had not. The stay-and-abeyance procedure was endorsed in limited circumstances in order to preserve the petitioner's interest in obtaining review of his claims. Id. at 278. In contrast, the good cause inquiry in this case would have involved issues of attorney negligence. In addition, Hutchinson's ability to attempt to prevail upon the stay-and-abeyance procedure turned on both his access to information about the procedure, and a presumption that he did not believe his attorneys' advice that the filing deadline for his application for state post-conviction relief in order to preserve his federal habeas corpus right was on October 20, 2005. Under these circumstances, it is far from certain that Hutchinson would have been granted stay-and-abeyance by a district court applying the good cause standard and unlikely that a panel of this Court would have reversed a district court denial thereof on an abuse of discretion review.

## II. Exceptions to Client Responsibility for Lawyer's Conduct

Death row inmates should not be precluded from having their federal claims reviewed because of their lawyer's negligence. Exceptions to the principle that all clients are responsible for the negligence of their lawyers exist elsewhere in the law. For example, when more important countervailing values are at stake, various rules of civil procedure provide courts with discretion to excuse procedural defaults in cases of lawyer negligence. See, e.g., Dove v. CODESCO, 569 F.2d 807, 810 (4th Cir. 1978) ("[T]he sanctions for attorney neglect should be borne if at all possible by the attorney himself rather than by his client."); Jackson v. Washington Monthly Co., 569 F.2d 119, 123, n.23 (D.C. Cir. 1977) ("[A] sound discretion hardly comprehends a pointless exaction of retribution. Dismissals for misconduct attributable to lawyers, and in no [way] to their clients, invariably penalize the innocent and may let the guilty off scot-free.").

Rule 60(b)(1), for example, provides relief from a final judgment for excusable neglect, which can "encompass situations in which the failure to comply with a filing deadline is attributable to negligence." United States v. Davenport, 668 F.3d 1316, 1324 (11th Cir. 2012). Similarly, Rule 55(c) has been applied to give a client relief from the entry of a default that was caused by the negligence of an attorney under the "good cause standard." Shepard Claims Serv., Inc. v.

27

William Darrah & Assocs., 796 F.2d 190, 195 (6th Cir. 1986). Exceptions such as those available under Rules 55(c) and 60(b) exist because, unlike a pure principal-agent relationship, most clients are not able to exercise perfect control over their lawyers.

Likewise, under Rule 11, the agency principle is put aside in order for courts to direct sanctions toward lawyers—and not their clients—when clients are not implicated in or aware of the offending attorney error, bad faith, or negligence that fall within a lawyer's professional zone of control. Under Rule 11, "[s]anctionable conduct by a party's counsel does not necessarily parlay into sanctionable conduct by a party." Byrne v. Nezhat, 261 F.3d 1075, 1123 (11th Cir. 2001) (citation omitted).

And under Rule 37, a district court has broad discretion to apportion sanctions for discovery abuses between lawyers and their clients. Devany v. Cont'l Am. Ins. Co., 989 F.2d 1154, 1162 (11th Cir. 1993). For example, Rule 37 is not construed to authorize the sanction of dismissal "because of petitioner's noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of petitioner." Societe Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 212 (1958). This Court has held that

"[a] party's simple negligence or other action grounded in a misunderstanding of a court order does not warrant dismissal." Equal Employment Opportunity Comm'n, 693 F.2d 1353, 1357 (11th Cir. 1982). See also Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1536, 1542 (11th Cir. 1993) (stating that "[v]iolation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default judgment or dismissal.").

Making death row inmates wholly responsible for a lawyer's negligence does not ensure that lawyers will timely assert their clients' claims. Death row clients have little ability to hold their lawyers accountable for their negligence. And a policy of punishing death row inmates for such mistakes does not improve the timeliness of lawyers' actions. While civil litigants can seek relief for a lawyer's mistake through a malpractice lawsuit, there is no remedy for a death row inmate. When a lawyer's negligence forecloses consideration of the entirety of the death row inmate's federal claims, the result is the imposition of the death penalty without federal review.

These cases and examples illustrate that countervailing values forge exceptions in the law. The countervailing value here is the protection of the right to federal review of a death row inmate's federal habeas petition, which is premised, in part, on "equitable principles [which] have traditionally governed the

29

substantive law of habeas corpus." Holland, 130 S. Ct. at 2560 (quotation marks omitted) (holding that the one-year statutory filing deadline for federal habeas petitions is subject to equitable tolling). Thus, in Holland, which presented the same question as is presented here, the Supreme Court framed the inquiry as one of how equity applies while still acknowledging the federal statutory filing deadline. See id. at 2563. The Court noted that the countervailing value of federalism weighs more heavily in the case of failing to comply with a state's procedural rules than it does for equitable tolling of the federal habeas filing deadline which is concerned only "with federal timing rules." Id. With these considerations in mind, the Court rejected a per se approach to the previously unqualified rule that "a petitioner must bear the risk of attorney error" in the context of Holland's case. Id.[22]

More recently in Maples, 132 S. Ct. at 924, the Court held that a lawyer's conduct that constitutes abandonment of his death row inmate client will also provide the necessary basis for equitable tolling of the federal habeas filing deadline. The Court reached this conclusion, in part, because even agency

---

[22] The crucial importance of the broader availability of equitable tolling is highlighted by the subsequent developments in Holland's case. Upon eventual remand to the district court, which granted Holland equitable tolling and then considered the merits of the constitutional claims raised in Holland's federal habeas petition, the court granted him habeas relief on his Faretta v. California, 422 U.S. 806 (1975) claim. Holland v. Tucker, No. 06-civ-20182 (S.D. Fla. March 30, 2012) (order granting in part petition for habeas corpus).

principles acknowledge an exception to the assumption that a client must bear the risk of the acts or omissions of his lawyer in the case of abandonment. Id.

However, to grant equitable tolling only in cases of complete lawyer abandonment or something akin to gross negligence does not go far enough. See Holland, 130 S. Ct. at 2567 (Alito, J., concurring in the judgment) ("Allowing equitable tolling in cases involving gross rather than ordinary attorney negligence would not only fail to make sense in light of our prior cases; it would also be impractical in the extreme. . . . [I]t has been aptly said that gross negligence is ordinary negligence with a vituperative epithet added."). Where is the equity in denying the same relief to one inmate just because the acts or omissions of his · lawyer were slightly less egregious than another inmate's lawyer? Instead, the reality is that death row inmates' access to competent, post-conviction legal representation is at best inconsistent and at worst non-existent and their ability to communicate freely and actively participate in their litigation is seriously compromised. Under this reality, I question whether strict adherence to the principle that a death row inmate must bear the consequences of his lawyer's negligence is fair or just.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JEFFREY GLENN HUTCHINSON,

        Petitioner,

v.

Case No.: *5:09-cv-261-RS*
Capital Case

WALTER A. McNEIL, as
the Secretary of the Florida
Department of Corrections, and
IRA W. McCOLLUM, as
the Attorney General of Florida,

        Respondents.

_____/

## AFFIDAVIT OF JEFFREY GLENN HUTCHINSON

I, Jeffrey Glenn Hutchinson, am the Petitioner in the above-styled cause, and hereby affirm that:

1. I make this affidavit in support of my claim that I am entitled to equitable tolling.

2. On July 1, 2004, the Florida Supreme Court affirmed by convictions and sentences, and on July 22, 2004, the mandate was issued.

3. In August, 2004, Harry Brody and Jeff Hazen, registry lawyers, were

1

APPENDIX A

appointed to assist me with my postconviction remedies.

4. On August 10, 2004, I received my first letter from Mr. Brody and Mr. Hazen, and the very next day, I sent them a letter thanking them for taking my case.

5. On August 18, 2004, I received confirmation that Harry Brody and Jeff Hazen were appointed as my new lawyers, I was excited to hear from them and wrote back the very next day, thanking them for acknowledging my letters; since my previous lawyers had not answered or acknowledged any of my letters.

6. On September 21, 2004, I had my first meeting with Mr. Hazen, and during that meeting he explained the postconviction process and how he and Mr. Brody planned to get me a new trial and, through that, released from prison.

7. On October 8, 2004, I had my first meeting with Harry Brody, and during that meeting, Mr. Brody told me, "Look, we know you're innocent and we're going to get you out of here." (His words as I recall them.) This made me so happy that I began to cry. It was the first time that I had a lawyer that I thought would stand up for me. I truly believed Mr. Brody would help to exonerate me.

8. On October 20, 2004, I had another meeting with Mr. Hazen, and during that meeting, I asked him if he or Mr. Brody had contacted any of the witnesses that would need to be present at the evidentiary hearing. He told me, "No," but not to worry about that because "we'll have plenty of time for that later on. (His words as I recall them.)

9. On November 4, 2004, I talked to Mr. Brody during a prearranged phone call, and during that conversation I expressed my concerns regarding the running of 28 U.S.C. § 2244 (d)(1)'s one-year limitations period and the fact that they had not

2

contacted any of the witnesses that would need to be present at the evidentiary hearing. In response, Mr. Brody told me, "Don't worry the time, we have almost a year to file the 3.850." (His words as I recall them.)

10. On December 10, 2004, I had another meeting with Mr. Brody, during which I again expressed my concerns about the running of the one-year period of limitations and the fact that they still had not contacted any of the witnesses that would need to be present at the evidentiary hearing.

11. On March 23, 2005, I had another meeting with Mr. Hazen, during which I asked him to file a "shell-brief" to ensure that the one-year limitations period for filing my 2254 petition would not expire, since they still had not contacted any of the witnesses that would need to be present at the evidentiary hearing. At that point, Mr. Hazen claimed that "a shell-brief doesn't provide the protection that it used to", but he assured me that "we still have plenty of time to get everything done." (His words as I recall them.)

12. On April 14, 2005, I had another meeting with Harry Brody, during which I asked him pointedly about whether or not they (Mr. Brody and Mr. Hazen) could file my rule 3.851 motion in time to prevent the one-year limitations period from expiring on my 2254 petition. Mr. Brody seemed visibly disoriented and smelled strongly of alcohol, despite the fact that he was eating "Altoids" breath mints. I asked him if he had been partying the night before and he changed the subject saying, "Don't worry about it; we still have plenty of time to file the 3.850." (His words as I recall them.)

13. On May 12, 2005, I had another meeting with Mr. Hazen, during which I again voiced my concerns about nothing being done regarding the witnesses, and again

3

I asked about filing a "shell-brief" to prevent the one-year limitations period from expiring on my 2254 petition, since the rule 3.851 motion was still not ready to file.   Mr. Hazen assured me that there was still "plenty of time" to file the rule 3.851 motion, and that it "was not due for several months." (His words as I recall them.)

14.   On July 14, 2005, I had a meeting with both Mr. Brody and Mr. Hazen, during which I asked them directly about filing the rule 3.851 motion (which was still not finished) and why they had still not filed a "shell-brief" to not only allow enough time to investigate all of the evidence and to contact all of the witnesses that would need to testify at the evidentiary hearing, but also to prevent the one-year limitations period from expiring on my 2254 petition.   Mr. Brody, who was sweating profusely and smelled of alcohol, became very angry and suddenly got up and left the meeting room.   I asked Mr. Hazen, "What was that all about?", and Mr. Hazen replied, "He's just having a lot of personal problems." (His words as I recall them.)

15.   On September 22, 2005, I had another meeting with both Mr. Brody and Mr. Hazen, during which I told them point blank and in no uncertain terms to "either file my rule 3.851 motion immediately or I will discharge you and file it myself." At that point Mr. Brody and Mr. Hazen both assured – promised – guaranteed me that they would file the motion on or before September 28, 2005, though they went on to say that we had 90 days after the mandate was issued by the Florida Supreme Court, so the rule 3.851 motion was not actually due until "October 20th." (Their words as I recall them.) Once again I told them that if they did not file the rule 3.851 motion immediately, I would file it myself, because that was the only way I could prevent the one-year limitations period from expiring on my 2254 petition.   And again both Mr. Brody and Mr. Hazen

4

"guaranteed" me that they would file the rule 3.851 motion no later than September 28, 2005.

16.   Had it not been for that promise from Mr. Brody and Mr. Hazen, I would have discharged them and filed a pro se rule 3.851 motion to prevent 28 U.S.C. § 2255 (d)(1)'s one-year limitations period from expiring.   See exhibits 1 and 2, respectively, facsimiles of the Notice of Pro Se Status and Rule 3.851 Motion that I would have filed on September 23, 2005, but for that promise.[1]

17.   Despite their promise, Mr. Brody and Mr. Hazen did not file my rule 3.851 motion until October 20, 2005 – 28 days after they promised me that they would do so and 21 days after my one-year period of limitations had expired.

18.   In sum, if Mr. Brody and Mr. Hazen had not lied to me I would have discharged them and personally filed my initial rule 3.851 motion on September 23, 2005, a date which would have tolled the one-year limitations period with six days remaining – making my initial 2254 petition timely.

Wherefore, I ask that the relief requested in the petition be granted, or for such other relief as the Court may deem just and proper.


## VERIFICATION OF DOCUMENT

I hereby declare under penalty of perjury that I have read this Affidavit and that

---

[1] For the Court's convenience, I have word-processed the handwritten pleadings and letters that are attached as exhibits.  That is why they are described as "facsimiles".  Should the Court wish to inspect or copy any of the original handwritten copies, however, I will gladly make them available.

the facts and matters stated in it are true and correct.

Executed on:

Respectfully submitted,

_June 15,_____,~~2009.~~
                    20 10.

Jeffrey Glenn Hutchinson
#124849-P2214S
Union Correctional Institution
7819 NW 228th Street
Raiford, FL  32026-4420

6