BARKETT, Circuit Judge,
concurring in the result only:
Initially, I disagree with the majority’s holding that Hutchinson was not reasonably diligent in pursuing his claims. He did everything any reasonable client would do to assure that his lawyers protected his interests, including imploring his lawyers to file his post-conviction pleadings in a timely manner. The majority’s suggestion that Hutchinson should have filed a placeholder pro se habeas petition is simply not logical when Hutchinson was represented by lawyers who were assuring him that his claims were being pursued.
However, no matter how diligent Hutchinson was or could have been, as the law stands today, this Court still could not grant Hutchinson the relief of equitable tolling because the Supreme Court has held that, notwithstanding his diligence, a defendant is responsible for and must bear the consequences of his lawyer’s negligence.[1] See Lawrence, 549 U.S. at 336-37, 127 S.Ct. 1079; Coleman v. Thompson, 501 U.S. 722, 753-54, 111 S.Ct. 2546, 115 *1104 L.Ed.2d 640 (1991); see also Martinez v. Ryan, 566 U.S. -, (2012) (slip op., at 7); Holland, 130 S.Ct. at 2563.
The holdings of Lawrence and Coleman are premised on the continued application to death row inmates of the agency theory of the lawyer-client relationship. See, e.g., Maples v. Thomas, 565 U.S. -, 132 S.Ct. 912, 922, 181 L.Ed.2d 807 (2012) (explaining that Coleman’s holding was based on “well-settled principles of agency law” that “the principal bears the risk of negligent conduct on the part of his agent”). However, as amplified below, none of the key assumptions underlying the application of an agency relationship to a death-sentenced client and his lawyer are valid in the post-conviction context.[2] When the law already recognizes equitable exceptions to holding a client responsible for his lawyer’s actions under circumstances with less drastic consequences, an exception should also be made for death row inmates so that their lawyer’s negligence does not preclude federal review of constitutional claims.
I. Agency Principles and Death Row Inmates
An agency relationship exists to permit one person to act on behalf of another.[3] Generally the principal chooses an agent to act on his behalf for a specific purpose,[4] and in a traditional lawyer-client relationship, a client hires a lawyer to represent him in a discrete legal matter. The legitimacy of transferring responsibility for the lawyer’s negligence from the lawyer to the client is based on several assumptions that underpin the agency relationship. First, it is assumed that the client voluntarily chooses his lawyer for competence, diligence, and loyalty.[5] Second, it is assumed that the client has the ability to direct the actions of the lawyer[6] or, at the very least, that constant and adequate opportunities exist for communication between the client and his lawyer.[7]
But these assumptions do not apply to inmates on death row, almost all of whom do not choose their lawyers. Instead they must depend on appointed or pro bono volunteer counsel who too often lack expertise in post-conviction death penalty representation. See, e.g., Maples, 132 S.Ct. at 918. Consequently, the representation provided in state and federal post-conviction proceedings is too often inade *1105 quate.[8] For example, former Florida Supreme Court Justice Raul Cantero stated that “some of the [appointed] counsel have little or no experience in death penalty-cases. They have not raised the right issues ... [and] [s]ometimes they raise too many issues and still haven’t raised the right ones.”[9] Florida Supreme Court Justice Barbara Pariente has also stated that “[a]s for [appointed] counsel, we have observed deficiencies and we would definitely endorse the need for increased standards for [appointed] counsel, as well as a continuing system of screening and monitoring to ensure minimum levels of competence.”[10] Likewise, Alabama’s death row representation suffers from the same problems. The Supreme Court noted that not only does Alabama set “low eligibility requirements for lawyers appointed to represent indigent capital defendants at trial,” Maples, 132 S.Ct. at 917, it is “[n]early alone” in not “guaranteeing] representation to indigent capital defendants in post-conviction proceedings,” id. at 918. Instead, Alabama primarily relies on the efforts of out-of-state volunteer lawyers to handle post-conviction representation. Id.
The agency analogy also breaks down because death row inmates have a limited ability to communicate with their lawyers.[11] Prisons are often located in far-flung places that are difficult for lawyers to reach and often the lawyers are not even located within the same state as their death row clients. Additionally, inmates have restricted access to phones, the internet, and law libraries. In Lawrence and Holland, it was the lack of access to word processing systems and a law library that hampered the petitioners’ ability to com *1106 municate with their attorneys. See Brief for Petitioners at 11 n. 25, Lawrence, 549 U.S. 327, 127 S.Ct. 1079 (No. 05-8820); Petitioner’s Brief on the Merits at 2 n. 1., Holland, 130 S.Ct. 2549 (No. 09-5327). In Alabama, death row inmates’ phone calls are limited to twenty-five minutes, with prison officials determining the schedule and frequency of phone conversations.[12] According to Georgia’s inmate orientation handbook, phone calls in Georgia prisons are limited to fifteen minutes.[13]
Moreover, if a death row inmate is held in a super-maximum security prison or a segregation housing unit (“SHU”), which most are, these barriers may be even more difficult to overcome. First, access to basic reading and writing materials may be entirely restricted, depending on how much of a security threat the inmate is deemed to be. See, e.g., Beard v. Banks, 548 U.S. 521, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006) (upholding prison regulation that denies access to written material to violent inmates). Second, communication with the outside world becomes even more challenging and more restricted. “In virtually every state, death-row inmates are ‘locked down’ in their cell for most of the day, have little or no access to educational or other prison programs, and experience great isolation and loss of relationships.”[14] As Justice Kennedy has observed, “incarceration at [a super-maximum security prison] is synonymous with extreme isolation.” Wilkinson v. Austin, 545 U.S. 209, 214, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). Finally, the psychological effects of spending extended periods in solitary confinement — commonly known as SHU syndrome — may impair an inmate’s mental capabilities to the extent that his active participation in litigation becomes impossible.[15]
Finally, even if death row inmates were given the ability to access their attorneys without these formidable obstacles, most death row inmates lack the skills and intellect to supervise, direct or police the activities of their lawyers in the way that the agency paradigm assumes. “Capital inmates almost uniformly are indigent, and often illiterate and uneducated.”[16] The dangers of these shortcomings are all the more pronounced in the context of federal habeas proceedings, “the unique and complex nature” of which the Supreme Court has long recognized. See McFarland v. Scott, 512 U.S. 849, 855, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994). “[T]he complexity of our jurisprudence in this area makes it unlikely that capital defendants will be able to file successful petitions for collateral relief without the assistance of persons learned in the law.” Id. at 855-56, 114 *1107 S.Ct. 2568 (internal alterations omitted); quoting Murray v. Giarratano, 492 U.S. 1, 28, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (Kennedy, J., joined by O’Connor, J., concurring in judgment); see also id., at 28, 109 S.Ct. 2765 (Stevens, J., joined by Brennan, Marshall, and Blackmun, JJ., dissenting) (“[T]his Court’s death penalty jurisprudence unquestionably is difficult even for a trained lawyer to master.”). Given its acknowledgment of the challenges habeas proceedings present to lawyers, it is not surprising that the Supreme Court recently noted in Martinez, swpra, at-(slip op., at 9), that “[t]he prisoner, unlearned in the law, may not comply with the State’s procedural rules or may misapprehend the substantive details of federal constitutional law.” Although Martinez dealt specifically with the ability of a prisoner to pursue a post-conviction petition in state court, there can be no doubt that the same limitations are present in the federal post-conviction context as well.[17]
Moreover, a habeas petitioner is not permitted to interfere with his lawyer’s determinations regarding which claims to raise. See Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Even if a client wanted to correct his lawyer’s mistakes, he would not be entitled to do so. A prisoner does not have a right to file pro se pleadings while represented by counsel. See United States v. Gwiazdzinski, 141 F.3d 784, 787 (7th Cir.1998). Courts routinely decline to consider pro se pleadings when an inmate is represented by counsel. See Downs v. McNeil, 520 F.3d 1311, 1324 (11th Cir.2008) (“[E]ven a savvy petitioner, who may see the clock running out on his habeas time, can only cajole [or] plead with his counsel to file the petition timely.”) (citations omitted); see also 11th Cir. R. 25-1 (“When a party is represented by counsel, the clerk may not accept filings from the party.”).[18]
These many obstacles render the principal-agent relationship inapplicable in the post-conviction context. An inmate’s inability to supervise and control the actions of his lawyer makes this relationship far more akin to the paradigm of an independent contractor than a traditional agency relationship.[19] The negligent acts of an independent contractor, unlike those of an agent, are not imputed to the employer for the very reason that the employer lacks the power to meaningfully supervise the contractor.
The reality of the quality of post-conviction death penalty representation available to indigent inmates on death row does not meet the Supreme Court’s recognition that Congress intended these inmates to have access to “quality legal representation” when it mandated the statutory right to counsel. McFarland 512 U.S. at 856, 859, *1108 114 S.Ct. 2568 (“[F]ederal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty.”); see also 18 U.S.C. § 3599(a)(2), (d) (2006) (recodification of 21 U.S.C. § 848(q)(4)-(10) (1988)). Congress provided for a statutory right to qualified counsel in federal habeas proceedings in light of the “seriousness of the possible penalty ... and the unique and complex nature of the litigation.” 18 U.S.C. § 3599(d). Indeed, the Supreme Court, recognizing the complexity of federal habeas proceedings, held that the statutory right to counsel must begin even prior to the filing of a federal habeas petition. McFarland, 512 U.S. at 855, 114 S.Ct. 2568.
The circumstances surrounding Hutchinson’s lawyers’ negligent filing of his state post-conviction motion in this case illustrate the difficulties faced by a death row inmate who attempts to work diligently with his lawyers. While on death row, Hutchinson maintained communication — to the best of his ability — with his lawyers and repeatedly asked them to timely file his state post-conviction motion so as to toll the filing deadline for Ms federal habeas petition.[20] Even the majority recognizes that Hutchinson was reasonably diligent up to the time that his lawyers filed his motion for state post-conviction relief. What other steps could Hutchinson reasonably have taken? Should he not have trusted his lawyers when they assured him they were aware of and would comply with all filing deadlines? There is certainly no expectation that a civil client will shadow his lawyer’s every move to ensure that all deadlines are met and all filings are in order. On the contrary, a represented client has every right to assume that his lawyer will competently discharge his duties.
Nonetheless, the majority concludes that Hutchinson was not reasonably diligent because he should have filed a pro se federal habeas petition and asked to have it held in abeyance until his efforts to secure state collateral relief were completed. This course of action surely cannot be required of a client when he has legal representation.[21] A reasonable prisoner would have *1109 no cause to file his own pleadings for the simple reason that it is assumed that it is his lawyer’s job to do so. Especially here, where Hutchinson’s lawyers repeatedly assured him that they would file on time, Hutchinson had no reason to pursue an alternative avenue of relief. Reasonably relying on his lawyers’ assurances that they were doing what was necessary to protect his federal habeas rights, Hutchinson did not file a pro se federal habeas petition until it was too late.
II. Exceptions to Client Responsibility for Lawyer’s Conduct
Death row inmates should not be precluded from having their federal claims reviewed because of their lawyer’s negligence. Exceptions to the principle that all clients are responsible for the negligence of their lawyers exist elsewhere in the law. For example, when more important countervailing values are at stake, various rules of civil procedure provide courts with discretion to excuse procedural defaults in cases of lawyer negligence. See, e.g., Dove v. CODESCO, 569 F.2d 807, 810 (4th Cir.1978) (“[T]he sanctions for attorney neglect should be borne if at all possible by the attorney himself rather than by his client.”); Jackson v. Washington Monthly Co., 569 F.2d 119, 123, n. 23 (D.C.Cir.1977) (“[A] sound discretion hardly comprehends a pointless exaction of retribution. Dismissals for misconduct attributable to lawyers, and in no [way] to their clients, invariably penalize the innocent and may let the guilty off scot-free.”).
Rule 60(b)(1), for example, provides relief from a final judgment for excusable neglect, which can “encompass situations in which the failure to comply with a filing deadline is attributable to negligence.” United States v. Davenport, 668 F.3d 1316, 1324 (11th Cir.2012). Similarly, Rule 55(c) has been applied to give a client relief from the entry of a default that was caused by the negligence of an attorney under the “good cause standard.” Shepard Claims Serv., Inc. v. William Darrah & Assocs., 796 F.2d 190, 195 (6th Cir.1986). Exceptions such as those available under Rules 55(c) and 60(b) exist because, unlike a pure principal-agent relationship, most clients are not able to exercise perfect control over their lawyers.
Likewise, under Rule 11, the agency principle is put aside in order for courts to direct sanctions toward lawyers — and not their clients — when clients are not implicated in or aware of the offending attorney error, bad faith, or negligence that fall within a lawyer’s professional zone of control. Under Rule 11, “[s]anctionable conduct by a party’s counsel does not necessarily parlay into sanctionable conduct by a party.” Byrne v. Nezhat, 261 F.3d 1075, 1123 (11th Cir.2001) (citation omitted).
And under Rule 37, a district court has broad discretion to apportion sanctions for discovery abuses between lawyers and their clients. Devaney v. Cont’l Am. Ins. Co., 989 F.2d 1154, 1162 (11th Cir.1993). For example, Rule 37 is not construed to authorize the sanction of dismissal “because of petitioner’s noncomplianee with a pretrial production order when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of petitioner.” Societe Internationale Pour Participations In *1110 dustrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). This Court has held that “[a] party’s simple negligence or other action grounded in a misunderstanding of a court order does not warrant dismissal.” Equal Employment Opportunity Comm’n v. Troy State University, 693 F.2d 1353, 1357 (11th Cir.1982). See also Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1536, 1542 (11th Cir.1993) (stating that “Violation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default judgment or dismissal.”).
Making death row inmates wholly responsible for a lawyer’s negligence does not ensure that lawyers will timely assert their clients’ claims. Death row clients have little ability to hold their lawyers accountable for their negligence. And a policy of punishing death row inmates for such mistakes does not improve the timeliness of lawyers’ actions. While civil litigants can seek relief for a lawyer’s mistake through a malpractice lawsuit, there is no remedy for a death row inmate. When a lawyer’s negligence forecloses consideration of the entirety of the death row inmate’s federal claims, the result is the imposition of the death penalty without federal review.
These cases and examples illustrate that countervailing values forge exceptions in the law. The countervailing value here is the protection of the right to federal review of a death row inmate’s federal habeas petition, which is premised, in part, on “equitable principles [which] have traditionally governed the substantive law of habeas corpus.” Holland, 130 S.Ct. at 2560 (quotation marks omitted) (holding that the one-year statutory filing deadline for federal habeas petitions is subject to equitable tolling). Thus, in Holland, which presented the same question as is presented here, the Supreme Court framed the inquiry as one of how equity applies while still acknowledging the federal statutory filing deadline. See id. at 2563. The Court noted that the countervailing value of federalism weighs more heavily in the case of failing to comply with a state’s procedural rules than it does for equitable tolling of the federal habeas filing deadline which is concerned only “with federal timing rules.” Id. With these considerations in mind, the Court rejected a per se approach to the previously unqualified rule that “a petitioner must bear the risk of attorney error” in the context of Holland’s case. Id.[22]
More recently in Maples, 132 S.Ct. at 924, the Court held that a lawyer’s conduct that constitutes abandonment of his death row inmate client will also provide the necessary basis for equitable tolling of the federal habeas filing deadline. The Court reached this conclusion, in part, because even agency principles acknowledge an exception to the assumption that a client must bear the risk of the acts or omissions of his lawyer in the case of abandonment. Id.
However, to grant equitable tolling only in cases of complete lawyer abandonment or something akin to gross negligence does not go far enough. See Holland, 130 S.Ct. at 2567 (Alito, J., concurring in the judg *1111 ment) (“Allowing equitable tolling in cases involving gross rather than ordinary attorney negligence would not only fail to make sense in light of our prior cases; it would also be impractical in the extreme.... [I]t has been aptly said that gross negligence is ordinary negligence with a vituperative epithet added.”). Where is the equity in denying the same relief to one inmate just because the acts or omissions of his lawyer were slightly less egregious than another inmate’s lawyer? Instead, the reality is that death row inmates’ access to competent, post-conviction legal representation is at best inconsistent and at worst non-existent and their ability to communicate freely and actively participate in their litigation is seriously compromised. Under this reality, I question whether strict adherence to the principle that a death row inmate must bear the consequences of his lawyer’s negligence is fair or just.
APPENDIX A
IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION
JEFFREY GLENN HUTCHINSON, Petitioner,
v.
WALTER A. McNEIL, as the Secretary of the Florida Department of Corrections, and IRA W. McCOLLUM, as the Attorney General of Florida, Respondents.
Case No. 5:09-cv-261-RS
Capital Case

AFFIDAVIT OF JEFFREY GLENN HUTCHINSON

I,Jeffrey Glenn Hutchinson, am the Petitioner in the above-styled cause, and hereby affirm that
1. I make this affidavit in support of my claim that I am entitled to equitable tolling.
2. On July 1, 2004, the Florida Supreme Court affirmed by convictions and sentences, and on July 22, 2004, the mandate was issued.
3. In August 2004, Harry Brody and Jeff Hazen, registry lawyers, were appointed to assist me with my postconviction remedies.
4. On August 10, 2004, I received my first letter from Mr. Brody and Mr. Hazen, and the very next day, I sent them a letter thanking them for taking my case.
5. On August 18, 2004, I received confirmation that Harry Brody and Jeff Hazen were appointed as my new lawyers, I was excited to hear from them and wrote back the very next day, thanking them for acknowledging my letters; since my previous lawyers had not answered or acknowledged any of my letters.
6. On September 21, 2004, I had my first meeting with Mr. Hazen, and during that meeting he explained the postconviction process and how he and Mr. Brody planned to get me a new trial and, through that, released from prison.
7. On October 8, 2004, I had my first meeting with Harry Brody, and during that meeting, Mr. Brody told me, “Look, we know you’re innocent and we’re going to get you out of here.” (His words as I recall them.) This made me so happy that I began to cry. It was the first time that I had a lawyer that I thought would stand up for me. I truly believed Mr. Brody would help to exonerate me.
8. On October 20, 2004, I had another meeting with Mr. Hazen, and during that meeting, I asked him if he or Mr. Brody had contacted any of the witnesses that would need to be present at the evidentia *1112 ry hearing. He told me, “No,” but not to worry about that because “we’ll have plenty of time for that later on.” (His words as I recall them.)
9. On November 4, 2004, I talked to Mr. Brody during a prearranged phone call, and during that conversation I expressed my concerns regarding the running of 28 U.S.C. § 2244(d)(l)’s one-year limitations period and the fact that they had not contacted any of the witnesses that would need to be present at the evidentiary hearing. In response, Mr. Brady told me, “Don’t worry the time, we have almost a year to file the 3.850.” (His words as I recall them.)
10. On December 10, 2004, I had another meeting with Mr. Brody, during which I again expressed my concerns about the running of the one-year period of limitations and the fact that they still had not contacted any of the witnesses that would need to be present at the evidentiary hearing.
11. On March 23, 2005, I had another meeting with Mr. Hazen, during which I asked him to file a “shell-brief’ to ensure that the one-year limitations period for filing my 2254 petition would not expire, since they still had not contacted any of the witnesses that would need to be present at the evidentiary hearing. At that point Mr. Hazen claimed that “a shell-brief doesn’t provide the protection that it used to”, but he assured me that “we still have plenty of time to get everything done.” (His words as I recall them.)
12. On April 14, 2005, I had another meeting with Harry Brody, during which I asked him pointedly about whether or not they (Mr. Brody and Mr. Hazen) could file my rule 3.651 motion in time to prevent the one-year limitations period from expiring on my 2254 petition. Mr. Brody seemed visibly disoriented and smelled strongly of alcohol, despite the fact that he was eating “Altoids” breath mints. I asked him if he had been partying the night before and he changed the subject saying, “Don’t worry about it; we still have plenty of time to file the 3.850.” (His words as I recall them.)
13. On May 12, 2005, I had another meeting with Mr. Hazen, during which I again voiced my concerns about nothing being done regarding the witnesses, and again I asked about filing a “shell-brief’ to prevent the one-year limitations period from expiring on my 2254 petition, since the rule 3.851 motion was still not ready to file. Mr. Hazen assured me that there was still “plenty of time” to file the rule 3.851 motion, and that it “was not due for several months.” (His words as I recall them.)
14. On July 14, 2005, I had a meeting with both Mr. Brady and Mr. Hazen, during which I asked them directly about fifing the rule 3.851 motion (which was still not finished) and why they had still not filed a “shell-brief’ to not only allow enough time to investigate all of the evidence and to contact all of the witnesses that would need to testify at the evidentiary hearing, but also to prevent the one-year limitations period from expiring on my 2254 petition. Mr. Brody, who was sweating profusely and smelted of alcohol, became very angry and suddenly got up and left the meeting room. I asked Mr. Hazen, “What was that all about?”, and Mr. Hazen replied, “He’s just having a lot of personal problems.” (His words as 1 recall them.)
15. On September 22, 2005, I had another meeting with both Mr. Brody and Mr. Hazen, during which I told them point blank and in no uncertain terms to “either file my rule 3.851 motion immediately or I will discharge you and file It myself.”
*1113 At that point Mr. Brody and Mr. Hazen both assured — promised—guaranteed me that they would file the motion on or before September 28, 2005, though they went on to say that we had 90 days after the mandate was issued by the Florida Supreme Court, so the rule 3.851 motion was not actually due until “October 20th.” (Their words as I recall them.) Once again I told them that if they did not file the rule 3.651 motion immediately, I would file it myself, because that was the only way I could prevent the one-year limitations period from expiring on my 2254 petition. And again both Mr. Brody and Mr. Hazen “guaranteed” me that they would file the rule 3.851 motion no later than September 28, 2005.
16. Had it not been for that premise from Mr. Brody and Mr. Hazen, I would have discharged them and filed a pro se rule 3.851 motion to prevent 26 U.S.C. § 2255(d)(l)’s one-year limitations period from expiring. See exhibits 1 and 2, respectively, facsimiles of the Notice of Pro Se Status and Rule 3.851 Motion that I would have filed on September 23, 2005, but for that promise.[1]
17. Despite their promise, Mr. Brody end Mr. Hazen did not file my rule 3.851 motion until October 20, 2005 28 days after they promised me that they would do so and 21 days after my one-year period of limitations had expired.
18. In sum, if Mr. Brody and Mr. Hazen had not lied to me I would have discharged them and personally filed my initial rule 3.851 motion on September 23, 2005, a data which would have tolled the one-year limitations period with six days remaining — making my initial 2254 petition timely.
Wherefore, I ask that the relief requested in the petition be granted, or for such other relief as the Court may deem just and proper.

VERIFICATION OF DOCUMENT

I hereby declare under penalty of perjury that I have read this Affidavit and that the facts and matters stated in it are true and correct.
Executed on:
June 15, 2010.
Respectfully submitted,
Jeffrey Glenn Hutchinson
# 124849-P2214S
Union Correctional Institution
7819 NW 228 th Street
Raiford, FL 32026-4420

. In order to merit equitable tolling; a petitioner must establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.” Holland v. Florida, 560 U.S. -, 130 S.Ct. 2549, 2562, 177 L.Ed.2d 130 (2010) (internal quotation marks omitted). A lawyer's negligence does not constitute an "extraordinary circumstance.” See id. at 2564 (citing Lawrence v. Florida, 549 U.S. 327, 336, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007)). Here, where Hutchinson’s lawyers negligently *1104 filed his state post-conviction petition too late to statutorily toll the federal habeas filing deadline, their negligence does not constitute an "extraordinary circumstance."

. See Adam Liptak, Foreword, Agency and Equity: Why do we blame clients for their lawyers’ mistakes?, 110 Mich. L.R. 875, 875 (2012) (stating that "clients and lawyers fit the agency model imperfectly. Agency law is built on the concepts of free choice, consent, and loyalty, and it is not unusual to find lawyer-client relationships in which some or all of these elements are missing.").

. See 1 Floyd R. Mechem Treatise on the Law of Agency § 80 (2d ed. 1914) ("It is the general rule that an agency may be created for the performance of any lawful act, and that whatever a person may lawfully do, if acting in his own right and in his own behalf, he may lawfully delegate to an agent.").

. See Restatement (Second) of Agency § 1 (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.”).

. See Model Rules of Prof'l Conduct R. 1.1, 1.3 (2009).

. See id. R. 1.2(a).

.See id. R. 1.4.

.See Jordan M. Steiker, Improving Representation in Capital Cases: Establishing the Right Baselines in Federal Habeas to Promote Structural Reform Within States, 34 Am. J.Crim. L. 293, 297-300 (2007) (discussing the "crisis” in the quality of representation in both the trial and post-conviction stages of capital cases); see also Jon B. Gold & Lisa Green-man, Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases 87-88 (2010) (discussing repercussions of inadequate representation in federal habeas context); American Bar Association, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Alabama Death Penalty Assessment Report 97 (June 2006) ("Although anecdotes about inadequate defenses long have been part of trial court lore, a comprehensive 2000 study shows definitively that poor representation has been a major cause of serious errors in capital cases as well as a major factor in the wrongful conviction and sentencing to death of innocent defendants.”); American Bar Association, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Georgia Death Penalty Assessment Report iii (January 2006) ("The State of Georgia is virtually alone in not providing indigent defendants sentenced to death with counsel for state habeas proceedings. The lack of counsel on state habeas ... creates a situation where this critical constitutional safeguard is so undermined as to be ineffective.”); American Bar Association, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Florida Death Penalty Assessment Report iv (September 2006) ("Florida’s statutory qualification requirements for capital collateral registry attorneys fall short of the requirements of the ABA Guidelines ... and are insufficient to ensure qualified counsel for every death-sentenced inmate.”).

. See Marc Caputo, Justice Blasts Lawyers Over Death Row Appeals, Miami Herald, Jan. 28, 2005, at 1B.

. See Gary Blakenship, Registry Lawyers Defended at Committee Meeting, Fla. Bar News, April 1, 2005, at 5.

. "[A] habeas petitioner’s limited ability to communicate with the outside world is a barrier to his ability to diligently request information from, or monitor the conduct of, his defaulting attorney.” See Marni von Wilpert, Comment, Holland v. Florida: A Prisoner’s Last Chance, Attorney Error, and the Antiterrorism and Effective Death Penalty Act’s One-Year Statute of Limitations Period for Federal Habeas Corpus Review, 79 Fordham L.Rev. 1429, 1469 (2010).

. Alabama Department of Corrections, Inmate Telephone System Admin. Reg. 431 § V(K) (2005).

. Georgia Department of Corrections, Orientation Handbook for Offenders 64, available at http://www.dcor.state.ga.us/pdf/GDC_Inmate_ Handbook.pdf.

. John H. Blume, Killing the Willing: "Volunteers,” Suicide and Competency, 103 Mich. L.Rev. 939, 966 (2004).

. See generally Craig Haney, Mental Health Issues in Long-term Solitary and ''Supermax” Confinement, 49 Crime & Delinq. 124, 130-141 (2003) (describing the SHU syndrome and the long-term effects of solitary confinement on prison inmates); Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash U. J.L. & Pol’y 325, 333-45 (2006) (same); see also Miller ex. rel. Jones v. Stewart, 231 F.3d 1248, 1252 (9th Cir.2000) (“[I]t is well accepted that conditions such as those present in SMU II ... can cause psychological decompensation to the point that individuals may become incompetent.”).

.Roscoe C. Howard, Jr., The Defunding of the Post Conviction Defense Organizations as a Denial of the Right to Counsel, 98 W. Va. L.Rev. 863, 902 (1996).

. See Halbert v. Michigan, 545 U.S. 605, 621, 125 S.Ct. 2582, 162 L.Ed.2d 552 (2005) (“Sixty-eight percent of the state prison population did not complete high school, and many lack the most basic literacy skills.... Seven out of ten inmates fall in the lowest two out of five levels of literacy-marked by an inability to do such basic tasks as write a brief letter to explain an error on a credit card bill, use a bus schedule, or state in writing an argument made in a lengthy newspaper article.”) (internal alterations and citations omitted).

. See also S.D. Fla. R. 7.7 (“Any party represented by an attorney shall not: (a) address or present to the Court in the form of a letter or the like any application requesting relief in any form, citing authorities, or presenting arguments: and (b) shall not furnish the Court with copies of correspondence between or among counsel, or any party represented by an attorney."); N.D. Fla. R. 7.1(F) (same); M.D. Fla. R. 2.03(d) ("Any party for whom a general appearance of counsel has been made shall not thereafter take any step or be heard in the case in proper person, absent prior leave of Court.”).

.See W. Page Keeton et al., Prosser and Keeton on Torts § 71 (5th ed.1984).

. The fact that Hutchinson signed the Rule 3.851 motion on October 19, 2005 does not establish beyond dispute that he knew that his attorneys had missed the deadline for filing his state petition. Although Hutchinson kept asking his lawyers to file his state petition, there is nothing to indicate that he knew the precise deadline. It is equally consistent with the facts to believe that he simply wanted his state petition filed and later accepted his attorneys’ advice that the deadline was October 20, 2005.

. Indeed, there is no guarantee that such a placeholder petition would be accepted by the federal district court. See Rhines v. Weber, 544 U.S. 269, 277, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005) ("[S]tay and abeyance should be available only in limited circumstances ... and is only appropriate when the district court determines there was good cause for the petitioner’s failure to present his claims first to the state courts.”). In a concurring opinion with the judgment in Rhines, Justice Stevens, with whom Justices Ginsburg and Breyer joined, observed that conditioning the stay-and-abeyance procedure on “good cause” instead of simply on a lack of “intentionally dilatory litigation tactics” left open the door for "[t]he trickiness of some exhaustion requirements to infect issues of good cause....” Id. at 279, 125 S.Ct. 1528. Moreover, Rhines concerned an issue distinct from the case at hand in which some habeas corpus claims had been exhausted in state court and others had not. The stay-and-abeyance procedure was endorsed in limited circumstances in order to preserve the petitioner’s interest in obtaining review of his claims. Id. at 278, 125 S.Ct. 1528. In contrast, the good cause inquiry in this case would have involved issues of attorney negligence. In addition, Hutchinson's ability to attempt to ■ prevail upon the stay-and-abeyance procedure turned on both his access to information about the procedure, and a presumption that *1109 he did not believe his attorneys' advice that the filing deadline for his application for state post-conviction relief in order to preserve his federal habeas corpus right was on October 20, 2005. Under these circumstances, it is far from certain that Hutchinson would have been granted stay-and-abeyance by a district court applying the good cause standard and unlikely that a panel of this Court would have reversed a district court denial thereof on an abuse of discretion review.

. The crucial importance of the broader availability of equitable tolling is highlighted by the subsequent developments in Holland's case. Upon eventual remand to the district court, which granted Holland equitable tolling and then considered the merits of the constitutional claims raised in Holland’s federal habeas petition, the court granted him habeas relief on his Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) claim. Holland v. Tucker, No. 06-civ-20182 (S.D.Fla. March 30, 2012) (order granting in part petition for habeas corpus).

. For the Court’s convenience, I have word-processed the handwritten pleadings and letters that are attached as exhibits. That is why they are described as "facsimiles”. Should the Court wish to inspect or copy any of the original handwritten copies, however, I will gladly make them available.